483 So.2d 1345 (1986)
Willie FROST
v.
STATE of Mississippi.
No. 55276.
Supreme Court of Mississippi.
February 19, 1986.
Robert H. Broom, Batesville, Thomas J. Lowe, Jr., Jackson, for appellant.
*1346 Edwin Lloyd Pittman, Atty. Gen. by John H. Emfinger, Sp. Asst. Atty. Gen., Jackson, for appellee.
Before ROY NOBLE LEE, P.J., and DAN M. LEE and ANDERSON, JJ.
DAN M. LEE, Justice, for the Court:
Willie Frost was convicted on April 15, 1983, of the murder of his two year old daughter, Theresa Coley. Frost received a sentence of life imprisonment. He appeals, assigning as error that the confessions obtained from him while incarcerated were given involuntarily, and the trial court erred in admitting them into evidence.
On December 7, 1981, Willie Frost reported to Bruff Turner, the chief of police of Como, Mississippi, that his two year old daughter, Theresa Coley, was missing. According to Frost, he had left the child in his car for seven or eight minutes while he went into a grocery store. When he returned to the car, the child was gone. The police, Willie, the child's mother (Mary Coley), Willie's wife, Cordelia, and several other concerned citizens searched diligently for the child, but could not find her.
Willie had picked the child up at its mother's house a few hours before. As the last person seen with the child, he soon became the target of investigation. He was asked to take a polygraph test the next day, but upon arriving in Oxford to take the test, he changed his mind, and was transported back to the Panola County jail in Batesville. He remained in jail overnight, but was released the next day.
Theresa's body was found in a cistern, located about one-half mile from Frost's house, on December 22, 1981. Frost was arrested on the same day and charged with Theresa's murder.
From December 22, 1981, until December 27, 1981, no one from the sheriff's department talked to Willie about the crime. He was also not informed of his rights during that time. However, on December 27th, Willie had four visitors who were members of his Masonic lodge. Those visitors were Earnest Jackson, Felix Webb, Thomas Morman, and Robert Gibson. After the four lodge members had talked with Frost for about one hour, he signed a waiver of his rights and gave the following statement:
On December 7, 1981, I was at Mary Coley's house. Betty Dean was on the outside of the house with Mrs. Sanford, the lady who owns the house Mary lives in. We had a discussion about the child. Me and Mary were making plans to see each other again. The plan was for me to pick Theresa up and leave her at the crossroads at the Four Way Inn Corner. Mary's cousin, unknown to me, was to pick the child up and carry the child to Memphis to her sister's house, Joyce Marie Wooten (Joyce Marie Sykes). I was to go back and pick Mary up and we were going to Memphis to her sister's house so we could get together. I told Mary around 3:05 and went to my trailer and put a piece on my water pipe. I stayed there about 30 minutes. I put the child in the car and started towards Como. The baby had on a blue cap, a red dress with blue and white collar. I got to the crossroads in about five minutes. I put the child out of the car and told her that someone would come and pick her up. The child said "alright Daddy". I then went to Como and parked in front of Monroe Pointer's and went into the Sunflower store and returned about seven or eight minutes later. That's when I reported the child kidnapped. Me and Como P.D. looked for the child for a few minutes on the street then Chief Turner told me to go and get Mary. I left Como around 4:20 to go to Mary's. When I got to Mary's she was at home. I blew the horn and Mary came to the car. I told Mary what I had told the police the child had been kidnapped and that he wanted me to bring her to town to look for the child. She said okay. When we first planned to do this, Mary had told me I had better not say anything because if I did she would tell her daddy, George Willie Coley and George would kill me. After I got back to Como with Mary he told us to go back home and wait to see *1347 if the child showed up. I carried Mary home and let her out. I then went and picked Cordelia [his wife] up at Clarence Taylor's place. I told her that Theresa was missing and for her to come with me and go to Mary's house. Cordelia got into the car and starting raising Hell about it. She told me I did not have any business being over there. We left Mary's and went to Como. We talked to Chief Turner and talked about someone was pulling a prank or something. We had made these plans while the child was in the hospital. Mary's sister's husband, Robert Wooten picked the child up or at least that what Mary told me that was supposed to pick the child up.
On December 28th Frost's lodge members returned to the jail. After speaking with them for a few minutes, Frost made the following statement:
I clocked out at work at 1400 hours and in Senatobia where I work at Chromecraft. I made a stop in Senatobia at a lumber yard to get a part for my trailer. I bought an elbow part to go on my pipe. I then went to a car wash in Senatobia and washed my car. I left Senatobia and went to Como and went to Mary's house. I got there about 1440 hours and stayed until about 1505. I left Mary's house with Theresa and drove down to my trailer. I fixed the pipe under my trailer. It probably took me thirty minutes. I left the trailer and came by the Four Way Corner and crossed Highway 310 West to the next road passed 310 South that turns right and made a right turn. When I got to where the cistern was I stopped my car and took Theresa out of the car, picked her up in my arms and carried her up the bank to where the cistern was. When I got up to the cistern the top was off the cistern. I held her up under her arm pits and dropped her in the cistern. I heard her body hit the water but I never heard her cry out or say a word. I got back in my car, a 76 Cordova Chrysler, and went over the hill and turned around and drove back to Four Way Corner and turned right and went to Como. When I got to Como, I parked my car and went into the Sunflower store and bought a chicken can of Spam and some Vienna sausage. I stayed in the store about seven minutes. When I left the store I went back to the car and that's when I began to ask if anyone had seen Theresa. I went on and reported the child kidnapped to Como P.D. I left Como about 4:20 and went to Mary's house. I told Mary that someone had gotten Theresa out of my car. Mary became upset when I told her. Mary got in the car and went back to Como with me to talk to police and to look for the baby. I carried Mary back home and let her out. I left Mary's and went and picked up my wife on the Clarence Taylor place and we drove back to Mary's house. I told Cordelia that someone had gotten Theresa out of my car. We drove back to Como and talked to the police and later returned to Mary's house. I had been under pressure from my wife about Theresa ever since we had been married. Every time Cordelia saw me talking to Mary or the child she would get mad and we would get into arguments. I knew we were moving up next to Mary and her mother and aunt. I figured it was going to be hard to live that close to all her folks and because of the child support money I was having to pay on the child. All other statements that I gave the law were made up stories.
The state's case against Willie Frost rested entirely upon his second statement given to the sheriff's department. No other testimony was offered which would link him with the crime, other than the brief testimony by the child's mother that she had left the child with Frost. For that reason, the remaining facts of this case will be summarized through the testimony at the suppression hearing of Sheriff Bryan, James Rudd, and the four lodge brothers who were present when Frost gave both statements. Sheriff Bryan testified in chambers that, when Frost gave his first statement on December 27, Robert Gibson, Thomas Morman, Felix Webb and Earnest *1348 Jackson were present. He testified that James Rudd was also present. According to Bryan, Frost did not initially want to sign the waiver of his rights, but he eventually did sign it at one time, and signed the statement at a different time. After the statement was given, Sheriff Bryan discussed it with the lodge members, who indicated that they did not believe it and were coming back the next day. Bryan testified that the lodge members did not tell him that they thought they could get Frost to tell the truth.
When the second statement was made, on December 28, the same four lodge members were in his office. Bryan testified that he did not have Frost sign an additional waiver, but he did inform Frost of his rights once again. The sheriff testified that he did not know if Frost had a lawyer at that time; Frost never said that Lee Calvin Buckley, with whom he had previously spoken, was his attorney. Bryan also testified that Frost became very emotional when he gave his statement.
James Rudd, a Deputy Sheriff of Panola County, next testified in chambers. He testified that he was present on December 27 when Frost was read his rights, but that he was not present when Frost gave his second statement. He testified that he had never talked to Frost about the case, that he had made him no threats or promises, but that he did encourage Frost to tell the truth.
Earnest Jackson, who is head of Frost's Masonic lodge, next testified in chambers. He stated that he did not talk to the sheriff before December 27, but that Frost requested the first meeting between himself and the lodge members. He testified that no threats or promises were made to Frost in order to get him to confess. Only two of the four lodge members who visited Frost were officers of the lodge  Jackson and Gibson  not Webb or Morman. Some of the lodge members had visited Frost at his home before he was arrested, to ask if there was anything they could do to help him. However, after the child was found in the cistern, the lodge could no longer support Frost and the members visited him in jail as part of their duty to investigate the situation.
Jackson testified that, on their first visit, they did not talk to Frost in his cell. They asked him if he had dropped the baby in the well, and told him the best thing for him to do was to tell the truth. After Frost gave his statement to them, the lodge members told him that they did not believe it. Jackson stated that he was not sure if Deputy Sheriff Rudd was always in the room during the first statement, but testified that Rudd did give Frost his rights. He further stated that the sheriff asked the lodge members to come back.
As to the second statement given on December 28, Jackson testified that, as soon as Frost was brought into the examination room, he volunteered to tell the truth. He testified that Frost became very emotional, and cried while giving the statement. While the lodge members offered to keep his story a secret, Frost volunteered to tell the sheriff. Jackson testified that the sheriff told Frost he could remain silent, and gave him his rights again. Jackson could detect no alcohol or drugs which would influence Frost's giving his statement.
Felix Webb testified in chambers that the four lodge members went to the jail at about 2:00 o'clock in the afternoon on the 27th. He said that they talked to Frost for about one hour, but that they made him no threats or promises in order to induce him to confess. He could not remember if Deputy Rudd was present during the first statement. He also could not remember if the sheriff asked him to come back the next day.
On the 28th, Webb testified that he, Frost, and Jackson were in the same room when Jackson made his confession. According to Webb, Frost started crying and volunteered to tell the truth. After Frost made the statement, Webb and Jackson asked him if he wanted to keep it a secret. Webb also testified that the sheriff read Frost his rights before he took down the statement.
*1349 Webb testified that he was one of the lodge members who went to Frost's house once before the body was found to ask if they could help. He stated that a lodge member could be suspended if he was charged with murder. He also stated that the lodge members visited Frost only in their capacity as lodge members, not as social acquaintances.
Thomas Morman testified in chambers that the four lodge members were contacted by Frost's brother before the 27th, and were told that Frost wanted to talk to them. He testified that they got to the jail at about 2:00 o'clock in the afternoon, and left at about 6:30 that evening. He testified that the sheriff was in the room during the statement but that no threats or promises were made. Morman also testified that the sheriff asked them to come back the next day.
With regard to the second statement, Morman remembered that the sheriff was in the room when it was given. He also remembered the sheriff reading Frost his rights. Morman stated in chambers that Frost had been suspended from the lodge while under investigation.
Robert Gibson was only called upon to testify during the proceedings in chambers. During those proceedings, he testified that on December 27th the lodge members got to the jail at about 2:00 o'clock in the afternoon, and stayed for about one hour. He also testified that no promises or threats were made to Frost. According to Gibson, he heard from lodge member Morman that Frost wanted to see them. Gibson also testified that the sheriff asked them to come back the next day.
As to the second statement on December 28th, Gibson repeated the testimony of the other lodge members. He stated that only two of the members went to see Frost at first, and that the sheriff was called in later.
Willie Frost testified in his defense both in chambers and before the jury. In chambers, he gave the following testimony regarding his first statement, made on December 27th. According to Frost the lodge members got to the jail at about 2:00 o'clock. All four of the lodge members were there, and no police were present except for Deputy Sheriff Rudd. Frost stated that he had not asked for the lodge members to come see him. He was told by his fellow lodge members that the investigation of Theresa's death was leading toward his wife; that the whole community was stirred up about the incident; and that the Jackson Masonic Lodge was upset about the situation. Frost said that, while he was giving his first statement, Deputy Sheriff Rudd repeatedly stated that "It didn't add up." Frost admitted that the sheriff told him when he gave his statement that he did not have to talk, but he was unsure about whether the sheriff told him that he could have a lawyer appointed for him or not. He said that the sheriff never asked him if he had a lawyer. Although Frost had talked to Lee Calvin Buckley, a local attorney, he had not employed him, and had seen no lawyers before December 27th. Frost stated that he did not ask his lodge members to come back to see him.
With regard to the second statement, Frost said that he had been told by Deputy Sheriffs Rudd and Sexton that things would be easier on him if he confessed. He said that his lodge brothers told him that, because of the crime, he was no longer in the Masonic circle. He also stated that, while he had been told when he was arrested that he had a right to an attorney, he was not again told about that right on the 28th. Frost admitted that he was not threatened at all, nor was he "harrassed" until December 27th. Frost stated that he was not asked to sign the second statement.
The trial judge admitted the statements into evidence, and the jury subsequently returned a verdict of guilty.
The primary issue on appeal is whether the confession given by Willie Frost was given freely and voluntarily. The trial court's ruling on the admissibility of the confession states in part as follows:

*1350 All the officers  law enforcement officials, who allegedly were present at the taking of either of the statements, have testified, as certainly they are required to do, once the voluntariness of the statement is put in question, and, indeed in addition to the law enforcement officials, we heard from the four lodge brothers of the defendant, and the defendant himself. I feel that in making a determination on the sole issue that being the voluntariness or lack of voluntariness on the part of the statements, I must look at the totality of the circumstances and not make a determination on the voluntariness or lack of voluntariness based on any limited factual inquiry. So, keeping all of that in mind, the court is satisfied and so finds that the state has met its burden of proof and has been  the state has met its burden of proof and the voluntariness of the statement have, in fact, been proved beyond a reasonable doubt, upon the proper predicate being laid in open court before a jury, assuming that to be the case, they will be admitted into evidence.
Under Mississippi law, in order for a confession to be admitted into evidence, it must have been given freely and voluntarily, and without the influence of promises or threats. McElroy v. State, 204 So.2d 463 (Miss. 1967); Gross v. State, 191 Miss. 383, 2 So.2d 818 (1941). The determination of the voluntariness of a confession is not made by the jury. Because of the inherent dangers involved in allowing the jury to pass on the admissibility of a confession, and then on guilt or innocence of the accused, it is the trial judge who determines whether a confession is indeed admissible. That process takes place outside the presence of the jury in a preliminary hearing. McElroy v. State, 204 So.2d 463, 465 (Miss. 1967); Draughn v. State, 76 Miss. 574, 25 So. 153 (1898). See also Jackson v. Denno, 378 U.S. 368, 380, 84 S.Ct. 1774, 1781, 12 L.Ed.2d 908, 918 (1964). In order to establish admissibility, the state has the burden of proof. Agee v. State, 185 So.2d 671 (Miss. 1966).
Once the trial judge has determined, at a preliminary hearing, that a confession is admissible, the defendant/appellant has a heavy burden in attempting to reverse that decision on appeal. That finding is considered a finding of fact which will not be reversed on appeal unless manifestly in error, or contrary to the overwhelming weight of the evidence. Clemons v. State, 316 So.2d 252 (Miss. 1975); Harrison v. State, 285 So.2d 889 (Miss. 1973); Bell v. State, 274 So.2d 371 (Miss. 1973); Gross v. State, 191 Miss. 383, 2 So.2d 818 (1941).
The trial judge in this case found that Frost's statements had been given voluntarily. After reviewing the evidence presented in the suppression hearing, we are unable to say that the trial judge was manifestly in error in so ruling. The testimony of the witness showed that no force, threats, or coercion caused Frost to make his statements. Furthermore, he was advised of his rights before giving both the December 27 and December 28 statements. Under these circumstances, we must affirm the trial court's finding that Frost's confession was given voluntarily.
We therefore affirm Willie Frost's conviction of murder and sentence of life imprisonment.
AFFIRMED.
PATTERSON, C.J., WALKER and ROY NOBLE LEE, P.JJ., and HAWKINS, PRATHER, ROBERTSON, SULLIVAN and ANDERSON, JJ., concur.