666 So.2d 1377 (1996)
John Max DOWBAK
v.
STATE of Mississippi.
No. 92-KA-00812-SCT.
Supreme Court of Mississippi.
January 18, 1996.
*1379 Mose Lee Sudduth, Jr., Columbus, for Appellant.
Michael C. Moore, Attorney General, Jeffrey A. Klingfuss, Sp. Asst. Attorney General, Jackson, for Appellee.
Before DAN M. LEE, C.J., and BANKS and JAMES L. ROBERTS, Jr., JJ.
DAN M. LEE, Chief Justice, for the Court:
Dr. John Max Dowbak (Dowbak) appeals his conviction in the Oktibbeha County Circuit Court for arson in the second degree. Dowbak was indicted and charged with hiring Reagan and Jean Barnett to burn an office building owned by Dowbak in Starkville. Dowbak's first trial resulted in a deadlocked jury. A second trial was held and that jury found Dowbak guilty of arson in the second degree. Dowbak was sentenced to serve four years in the custody of the Mississippi Department of Corrections and ordered to pay a fine of $5,000. Dowbak promptly filed his post-trial motions which were denied by the trial judge. Thereafter, Dowbak filed his notice of appeal with this Court and assigns as error the following:
I. THE LOWER COURT ERRED IN OVERRULING APPELLANT'S MOTION TO DISMISS FOR THE STATE'S VIOLATION OF APPELLANT'S FIFTH, SIXTH AND FOURTEENTH AMENDMENTS RIGHTS BY USING APPELLANT'S WIFE AS A CONFIDENTIAL INFORMER.
II. THE LOWER COURT ERRED IN OVERRULING APPELLANT'S MOTION TO DISMISS FOR THE STATE'S DISCOVERY VIOLATION OF RULE 4.06 OF THE CRIMINAL RULES OF CIRCUIT COURT.
III. THE LOWER COURT ERRED IN ALLOWING PROSECUTORIAL MISCONDUCT BEFORE AND THROUGH OUT THE TRIAL OF THE APPELLANT.
IV. THE LOWER COURT ERRED WHEN THE TRIAL JUDGE DID NOT RECUSE HIMSELF WHEN HIS BROTHER-IN-LAW WAS RETAINED BY APPELLANT AT HIS SECOND TRIAL, AND THE LOWER COURT FAILED TO FOLLOW THE PROPER PROCEDURE FOR HANDLING SUCH A CONFLICT AS REQUIRED BY LAW.

STATEMENT OF THE CASE
Dowbak was indicted in the Oktibbeha County Circuit Court and charged with violation of Miss. Code Ann. § 97-17-5 (1972) (second degree arson). Dowbak pled not-guilty and was tried in February of 1992. The jury deadlocked as to Dowbak's guilt and a mistrial was declared. Thereafter, Dowbak was retried on May fourth through seventh, 1992, before a second jury, and this jury found Dowbak guilty of arson in the second degree. Dowbak was sentenced to a term of four years in the custody of the MDOC and fined $5,000.
On May 15, 1992, Dowbak filed a motion for a judgment notwithstanding the verdict or alternatively, a new trial. This motion was denied on June 15, 1992. Dowbak obtained *1380 new counsel who filed a motion for leave to file an amended motion for new trial on July 23, 1992. This motion was denied on August 7, 1992. Dowbak now files his appeal with this Court.

STATEMENT OF THE FACTS
Dowbak does not challenge the weight and sufficiency of the evidence on appeal. Instead, Dowbak primarily chooses to submit as error the fact that his wife acted as a confidential informant for the Starkville Police Department between the first trial and second trial. Accordingly, we will not delve too deeply into the various facts of the actual arson for which Dowbak was convicted.
On the evening of May 13, 1991, Jean Barnett[1] and her husband Reagan Barnett traveled from Corinth to Starkville where they entered an office building owned by Dowbak and proceeded to set the building on fire. After setting the fire, the Barnetts returned to their home in Corinth. Jean Barnett testified that her husband Reagan was to later receive $10,000 from Dowbak for torching the building and that she was to receive $1,000 from her husband for her part.
The building suffered water damage, smoke damage and actual physical damage from the fire. However, Dowbak's building was not totally destroyed and soon after the fire was extinguished, it became evident to investigators that the fire had been intentionally set.
The Starkville authorities investigated the fire as an arson but had no real leads on the blaze until Jean Barnett, embroiled in a battle with Reagan over the custody of their daughter, confessed her and Reagan's involvement in the Starkville arson to Bobby Grimes and Emmett Boozer.[2] (T. 287). Jean's confession eventually led to Dowbak's arrest and ultimately, to his conviction.
Before the start of his second trial, Dowbak was informed by the district attorney's office that they had statements from a confidential informant but did not intend to use the statements or call the informant at the second trial. Dowbak filed a motion to compel discovery on May 1, 1992, and the motion to compel was argued prior to the jury's empaneling.
The motion to compel discovery revealed that at some point after Dowbak's first mistrial but before his second trial, Dowbak's wife, Lisa, informed of Dowbak's affair with one of his office employees, contacted Captain David Lindley of the Starkville Police Department and indicated that she wished to serve as a confidential informant. The pair then began a series of contacts conducted over the telephone. Some of these calls were initiated by Lisa and some by Lindley. Lindley testified that all of his calls to Lisa were made from the police station and were recorded by the department's automatic recording device.[3] Lindley also testified that Lisa called him at the police station a number of occasions. All totaled, Lisa and Lindley conferred by telephone approximately ten times during the time between Dowbak's first trial and his second trial.
Lindley's initial conversation with Lisa was recorded and a transcription of that conversation was made. Lindley was questioned at the discovery motion hearing regarding the transcript. Lindley, questioned as to why there were not other tapes or transcriptions, testified that the tapes of the remaining conversations were of no value to the investigation and were recorded over as was consistently done by the department.
After hearing the above testimony from Lindley and Lisa, the trial judge held that Lisa had initiated the contact and that she could not be called to the stand. The court *1381 ordered that the prosecution furnish Dowbak a copy of the transcribed conversation between Lindley and Lisa.

DISCUSSION

I. THE LOWER COURT ERRED IN OVERRULING APPELLANT'S MOTION TO DISMISS FOR THE STATE'S VIOLATION OF APPELLANT'S FIFTH, SIXTH AND FOURTEENTH AMENDMENTS RIGHTS BY USING APPELLANT'S WIFE AS A CONFIDENTIAL INFORMER.
Dowbak's argument here is two-fold. First, that Lisa's discussions with Lindley violated Rule 504 of the Mississippi Rules of Evidence (husband-wife privilege); (See also Miss. Code Ann. § 13-1-5) and second, that Lisa's conversations with Lindley violated Rule 502 of the Mississippi Rules of Evidence (attorney-client privilege).
The record reflects that Lisa did not testify for or against her husband at his second trial. Likewise, an examination of the record indicates that Lindley did not testify at Dowbak's second trial.
Throughout this assignment of error, Dowbak attempts to equate Lisa's conversations with Lindley as testimony. Dowbak states that
[e]ach State witness that testified as a result of the Lisa-Lindley conversations to rebut Dowbak's defense was a violation of the husband-wife privilege. We do not know which witnesses these were or how many, we do know that Lindley had all the tapes at his disposal, but destroyed through erasure  all but one.
Dowbak gives the historical and public policy underpinnings for the spousal-immunity privilege and argues that if this privilege is not respected, then the defendant has been denied due process of law and the sentence must be reversed.
Dowbak offers several cases in support of his argument that he was denied due process as a result of Lisa's conversations with Lindley. First, Dowbak offers Wallace v. State, 254 Miss. 944, 183 So.2d 525, 526 (1966), for the proposition that it is reversible error for the State to offer a wife's testimony against her husband at trial. In Wallace, the State called the defendant's wife to testify at her husband's murder trial. In the case sub judice, Lisa Dowbak was not called at trial to testify against her husband. Nor did the prosecution attempt to offer Lisa as a witness at trial. Lisa did take the stand before the trial and testified that she had no objection to the district attorney's office revealing her as its confidential informant. It should be noted that Dowbak and not the district attorney called Lisa to the stand on this occasion. Accordingly, Wallace is not dispositive to this case.
Next, Dowbak cites Bayse v. State, 420 So.2d 1050, 1053 (Miss. 1982), to support his argument that he was denied due process when Lisa spoke to Lindley. In Bayse, this Court held that the trial judge committed reversible error when he allowed a police officer to testify as to out of court statements the defendant's wife made to him (the officer). Id. at 1053. Once again we find that the facts of this case are distinguishable from those found in Bayse. In the case at bar, Lindley did not testify at Dowbak's second trial. Therefore, he could not have repeated conversations he had with Lisa to the jury. Accordingly, we find that Bayse affords Dowbak no relief.
The State contends that our holding in Ladner v. State, 584 So.2d 743 (Miss. 1991), cert. denied 502 U.S. 1015, 112 S.Ct. 663, 116 L.Ed.2d 754 (1991), is dispositive to the issue now before the Court. In Ladner, the defendant's wife informed police that her husband kept a gun at her parent's home. The police went to the parent's home and found the gun that Ladner had used to commit a murder. At trial, Ladner attempted to suppress the gun arguing that it was found in violation of the spousal privilege. The trial judge refused to suppress the gun and on appeal, we held that the trial judge was not manifestly *1382 wrong in his decision not to suppress the gun. Ladner, 584 So.2d at 748, (citing Lockett v. State, 517 So.2d 1317, 1328 (Miss. 1987)) (citing Frost v. State, 483 So.2d 1345, 1350 (Miss. 1985), cert. denied, 487 U.S. 1210, 108 S.Ct. 2858, 101 L.Ed.2d 895 (1988)). We then stated:
We have been cited to no case in which this Court has extended the spousal privilege to require suppression of physical evidence which has been obtained by law enforcement officers as a result of their conversations with a spouse. We do not find in this case a violation of either of the statute concerning spousal competency, Miss. Code Ann. § 13-1-5 (Supp. 1990), or the evidence rule concerning the husband-wife privilege, M.R.E. 504. Rule 504 gives a defendant the privilege of prohibiting his or her spouse from testifying as to any confidential communications between the spouses. Neither an out-of-court statement nor trial testimony of his wife was admitted against Ladner.
Ladner, 584 So.2d at 748. (emphasis added).
In the case sub judice, Dowbak wants this Court to interpret M.R.E. 504 and Miss. Code Ann. § 13-1-5 in such a manner so as to hold that a spouse cannot help law enforcement officers investigate or solve crimes in which their spouse might be involved. We rejected this proposition in Ladner and once again, we reject this proposition in the case sub judice. Dowbak offers no case law from any jurisdiction to support his expansive view of the spousal-immunity privilege and we find no good reason to interpret the spousal privilege so expansively.
In summary, we find that the facts of this case do not support Dowbak's claim that the State violated the spousal-immunity privilege. Lisa Dowbak was not called to testify at Dowbak's trial, nor did the State attempt to call Lisa. Likewise, Lindley did not testify during Dowbak's second trial so he could not have informed the jury of any confidential conversations between Dowbak and Lisa. Accordingly, it is this Court's opinion that Ladner is controlling and thus, this part of assignment 1 is without merit.
Dowbak also argues that his wife's conversations with Lindley violated his attorney-client privilege and that, therefore, his conviction must be reversed. Dowbak claims that the prosecution used Lisa as a "spy" to keep them informed of his trial strategy.
Notwithstanding this claim, Dowbak cannot point to any examples in the record where the prosecution called Lisa and asked her about the defense's strategy. In fact, Dowbak had Lisa take the stand in a pretrial motion hearing and asked her about her conversations with Lindley. The scope of Dowbak's questioning of Lisa appeared to be whether Lisa knew that her conversations with Lindley were being recorded. Dowbak did not develop evidence, through Lisa's testimony or otherwise, to establish that Lindley called Lisa to get information from her regarding Dowbak's meetings with his lawyers. Likewise, Dowbak did not ask Lisa whether she had given information regarding Dowbak's meetings with his lawyer to Lindley.
At some point in his initial conversation with Lisa, Lindley asked her if anyone contacted her and asked her to lie about the case. Lisa responded and said that during the first trial Dowbak's lawyer had asked her if he could put her on the stand. Lisa also indicated to Lindley that she thought her husband's lawyers were trying to keep her out of town because Dowbak's lover, Laurie Pickering, was testifying. Lisa also indicated to Lindley without any prompting that Dowbak's lawyers thought he was in need of psychiatric help because of his unusual conduct. Nonetheless, we note that Dowbak did not attempt to use mental illness as a defense at trial nor does he contend that he was somehow unable to use mental illness as a defense because of his wife's contact with Lindley.
Dowbak cites Pendergraft v. State, 191 So.2d 830 (Miss. 1966) for the proposition that he is entitled to have the assistance of counsel. Further, Dowbak offers United States v. Levy, 577 F.2d 200, 210 (3rd Cir.1978) for the proposition that because Lisa revealed *1383 Dowbak's trial tactics to Lindley, his indictment must be dismissed. In Levy, the defendant along with his nephew were arrested for various drug violations. Both men hired the same attorney and met together and discussed trial strategy. Unbeknownst to Verna, his nephew, and co-indictee, had become a confidential informant for the Drug Enforcement Agency. Thus, while Verna's nephew was sitting in on strategy sessions with Verna and their attorney, he was acting as an informant for the DEA. Id. at 202-203. The Third Circuit found that there had been an actual disclosure of the pair's defense strategy and applied a per se presumption of prejudice and dismissed Verna's indictment. Id. at 210.
The Third Circuit in Levy adopted a per se rule as to attorney-client disclosures that had previously been rejected by the United States Supreme Court in Weatherford v. Bursey, 429 U.S. 545, 97 S.Ct. 837, 51 L.Ed.2d 30 (1977). In Weatherford, the United States Supreme Court held that a party was not deprived of his right to effective counsel, nor denied a fair trial, and that the Sixth Amendment does not establish a per se rule forbidding an undercover agent from meeting with a defendant's counsel. In Weatherford, the petitioner (Weatherford), a government informant, met with respondent (Bursey) and his attorney on two occasions and discussed Bursey's approaching trial. Weatherford did not seek information from Bursey or his attorney nor did he initiate or ask for the meeting. He was brought into the meetings by Bursey and Bursey's attorney in an effort to obtain information, ideas or suggestions as to the plaintiff's defense. Subsequently, Weatherford testified against Bursey, and Bursey was convicted. Thereafter, Bursey instituted a § 1983 action against Weatherford alleging that Weatherford had communicated defense strategies and plans which he had learned at his meetings with Bursey and his attorney to the prosecution, thereby depriving Bursey of the effective assistance of counsel. Id. at 547-548, 97 S.Ct. at 840.
The district court reversed Bursey's conviction and held that there had been a violation of Bursey's Sixth and Fourteenth Amendment rights. The Court of Appeals agreed and held that "whenever the prosecution knowingly arranges or permits intrusion into the attorney-client relationship the right of counsel is sufficiently endangered to require reversal and an new trial." Id. at 549, 97 S.Ct. at 840-841. The United States Supreme Court rejected the Court of Appeals per se rule and found that this was not a situation where the State's purpose was to learn what it could about the defendant's defense plans. Further, the informant was not instructed to intrude on the lawyer-client relationship nor was this a situation in which the informant assumed that task for himself and acted accordingly. Weatherford went to the meetings not to spy but to maintain his undercover status. Weatherford, 429 U.S. at 557, 97 S.Ct. at 844. The Court held:
There being no tainted evidence in this case, no communication of defense strategy to the prosecution, and no purposeful intrusion by Weatherford, there was no violation of the Sixth Amendment insofar as it is applicable to the States by virtue of the Fourteenth Amendment.
Weatherford, 429 U.S. at 558, 97 S.Ct. at 845.
We find that Dowbak's argument as to this issue is without support in the record and is devoid of merit. In the case sub judice, there is no indication that Lisa informed the prosecution of Dowbak's defense strategy. In fact, Dowbak's defense throughout was that Barnett torched his building because Dowbak had discharged him from the hospital before Barnett was ready to be discharged. Dowbak did not attempt to put on an insanity defense, accident defense or any other type of defense. Like Weatherford, there was no tainted evidence admitted into evidence in this case (Lisa was not called to testify), and no purposeful intrusion by Lisa or the State (Lisa was asked to attend the meetings by Dowbak's attorneys and the record does not indicate that the State instructed Lisa to spy on Dowbak's meetings; nor does it appear that Lisa called Lindley and informed him of the contents of each meeting.). Finally, unless Lisa communicated *1384 the substance of Dowbak's conversations and thereby created a realistic possibility of injury to Dowbak or benefit to the State, there can be no Sixth Amendment violation. Weatherford, 429 U.S. at 558, 97 S.Ct. at 845. We find that the record is lacking any proof that would indicate that Lisa communicated the substance of Dowbak's conversations with his attorneys to the prosecution. Accordingly, this assignment of error is without merit.

II. THE LOWER COURT ERRED IN OVERRULING APPELLANT'S MOTION TO DISMISS FOR THE STATE'S DISCOVERY VIOLATION OF RULE 4.06 OF THE CRIMINAL RULES OF CIRCUIT COURT.
Dowbak argues that his conviction should be reversed because the prosecution failed to provide him with the name of its confidential informant (Lisa Dowbak) until the trial had started. Dowbak strenuously argues that his conviction should be reversed due to the State's failure to disclose the fact that his wife had been in contact with the police since after the mistrial.
Lisa Dowbak, upset by the revelation that her husband was having an affair with an employee, contacted Captain Lindley of the Starkville Police Department after Dowbak's mistrial. It would appear from the record that the pair, Lindley and Lisa, spoke approximately ten times from February 3, 1992, until the start of Dowbak's second trial. On May 1, 1992, the prosecution notified Dowbak that it had a confidential informant that it had been in contact with, but that the prosecution did not intend to call the confidential informant.
Dowbak contends that Rule 4.06(b)(2) of the Unif.R.Cir.Ct.Pract. mandated the disclosure of the identity of the confidential informant. Notwithstanding Dowbak's assertion, this Court has recognized that an accused is not automatically entitled to disclosure of the identity of a confidential informant. Middlebrook v. State, 555 So.2d 1009 (Miss. 1990). Rule 4.06(b)(2) provides:
(b) The court may deny disclosure authorized by subsection (a) if it finds that there is a substantial risk to any person of physical harm, intimidation, bribery, economic reprisals, or unnecessary annoyance or embarrassment, resulting from such disclosure, which outweighs any usefulness of the disclosure to defense counsel.
The following shall not be subject to disclosure:
(2) Informants. Disclosure of an informant's identity shall not be required unless the confidential informant is to be produced at a hearing or trial or a failure to disclose his or her identity will infringe the constitutional rights of the accused or unless the informant was an eyewitness to the event or events constituting the charge against the defendant.
This Court has sometimes stated the rule as requiring disclosure when the informant was an eyewitness to, or a participant in the crime. Middlebrook v. State, 555 So.2d at 1010. In the case sub judice, Dowbak does not contend that he was entitled to discover the identity of the confidential informant (Lisa) because Lisa was an eyewitness to the crime. Instead, Dowbak argues that the State's failure to inform him that Lisa was acting as a confidential informant denied him his constitutional rights. Dowbak does not delineate in this assignment of error which of his constitutional rights were denied him, i.e., confrontation, effective assistance of counsel, etc.
We find that the prosecution did not err in failing to disclose Lisa's identity. Lisa was not an eyewitness to the crime. Lisa was not to be called as a prosecution witness at the trial, nor was she called. Likewise, Lindley was not called as a witness, nor did anyone testify as to the conversations Lisa had with Lindley. Accordingly, the district attorney was not required under the facts of this case to disclose Lisa's identity as a confidential informant.
Assuming arguendo that Dowbak is correct and the prosecution should have disclosed *1385 Lisa's identity as a confidential informant we find that Dowbak has waived this issue. This Court has held that "an accused's remedy for tardy disclosure of that to which he is entitled in pre-trial discovery is a continuance under the circumstances." McCaine v. State, 591 So.2d 833, 836 (Miss. 1991) (citing Middlebrook, 555 So.2d at 1011); Moore v. State, 536 So.2d 909, 911 (Miss. 1988). This Court has also held that the accused's concomitant right to a continuance is not self-executing and that he must affirmatively request a continuance or waive the issue. McCaine, 591 So.2d at 836 (citing Middlebrook, 555 So.2d at 1011).
In the case sub judice, Dowbak did not request a continuance. Likewise, Dowbak did not request a mistrial when told the identity of the State's confidential informant. See West v. State, 553 So.2d 8, 18 (Miss. 1989) ("motion for a mistrial in this context is the functional equivalent of a motion for a continuance"). Accordingly, because Dowbak failed to request a continuance or mistrial on the discovery issue, we find that Dowbak has waived this issue and therefore, this assignment merits Dowbak no relief. Middlebrook, 555 So.2d at 1011.

III. THE LOWER COURT ERRED IN ALLOWING PROSECUTORIAL MISCONDUCT BEFORE AND THROUGH OUT THE TRIAL OF THE APPELLANT.
In this assignment of error Dowbak contends that the prosecutor made several comments, during closing argument, on his failure to take the stand. Dowbak contends that the prosecutor's comments violated Dowbak's Fifth Amendment right against self-incrimination and require that his case be reversed and rendered.
Dowbak relies on Butler v. State, 608 So.2d 314 (Miss. 1992), to support his argument that the prosecutor impermissibly commented on his failure to take the stand. "When an accused exercises his or her constitutional right not to testify, the circuit judge must see that the State makes no direct or indirect comment on this fact." Butler, 608 So.2d at 318 (citing Ladner v. State, 584 So.2d 743, 754 (Miss. 1991), cert. denied 502 U.S. 1015, 112 S.Ct. 663, 116 L.Ed.2d 754 (1991)).
Dowbak offers the following statements from the State's closing argument and suggests that these statements were direct or indirect comments on his failure to take the stand. The first statement is as follows:
First of all, there's a day involved, May 13, 1991. I don't think anybody's in disagreement about that or  or the identity. It's not a who-dun-it you will."
The district attorney in this segment of closing argument is discussing what the jury must find under Jury Instruction S-2A to find Dowbak guilty of arson in the second degree. Here the district attorney is simply arguing that the date of the fire and the actual identity of the parties who physically set the fire are not in dispute. The district attorney then argues to the jury that the sole issue for them to determine was whether Dowbak recruited Barnett to burn his office building on the day in question. This argument was permissible and we find no mention here of Dowbak's failure, either directly or indirectly, to take the stand.
Next, Dowbak assigns the following comments as error:
Who says Debra Dillingham told you a lie? What evidence contradicted Debra Dillingham ladies and gentlemen? Who said that to you? Who says ladies and gentlemen that Reagan Barnett is a professional crook? Who says that? Over and over and over again, the lawyers say that ladies and gentlemen. Yeah, he's been convicted of insurance fraud. He's on probation ladies and gentlemen. Probation, he must really be a thug. They thought enough of him they put him on probation. He has been convicted of a felony, yes, he is a convicted felon, but who told you he is a professional criminal, who told you that he's proficient in picking locks, who painted this demon from hell called Reagan *1386 Barnett. Where's the evidence of it ladies and gentlemen. That is no more than rank speculation and conjecture and guesswork. (emphasis added).
During his closing argument, Dowbak's attorney suggests that Debra Dillingham Ross is lying about Dowbak getting in Jean Barnett's car and riding around town with her for approximately thirty minutes.[4] The district attorney pointed out on closing argument that Dowbak called several witnesses in his case and that there was no testimony as to Ross being a liar and in fact indicates that the jury must determine the weight and credibility to be afforded Ross's testimony.
Next, Dowbak's attorney argued that Reagan Barnett was a convicted felon and that he had a motive for burning down Dowbak's office building. Dowbak argues that Reagan Barnett was motivated by revenge in burning down Dowbak's office because Dowbak had discharged Reagan from the Oktibbeha County Hospital and put a stop to a fraudulent insurance scam in which Reagan was collecting one-hundred dollars per day for phony injuries. A search of the record does not reveal any testimony which would indicate that Reagan was involved in an insurance scam while a patient at the Oktibbeha County Hospital. Instead, the testimony simply reveals that Dowbak had told several nurses that he was afraid of Reagan and did not want to be at the hospital when Reagan was discharged.[5] Accordingly, we find that the above comments are not comments on Dowbak's failure to take the stand but are comments regarding the paucity of evidence before the jury to support Dowbak's defense. Shook v. State, 552 So.2d 841, 851 (Miss. 1989).
Dowbak assigns the following as further comment by the prosecution on the defendant's failure to take the stand:
Well that's true. Dr. Dowbak communicated his fear to us. Ladies and gentlemen, all rank speculation, all nothing more than guesswork but there's even worse speculation than that. Because it is intimated that the Lieutenant of Detectives, wanted to get his picture in the paper and so he is trying to railroad this case through. Now ladies and gentlemen, I don't know what you think of the Starkville Police Department, I don't know what you think of the caseload and the amount of work they have to do, but I assume that if you think Ed Brennan was going to manufacture evidence and was going to tell stories on the witness stand and make up things to railroad an orthopaedic surgeon, I would have at least told you to give him credit for being able to make up a good story. See ladies and gentlemen Ed Brennan didn't have to testify to what he did. If he was going to make up things ladies and gentlemen, he could have gotten on that witness stand and said, yeah, I saw John Dowbak sitting out front when I got out of that house. I asked him about who would burn down a house and he broke down in tears right there in front of me, started crying and said I did it, I did it, I burned the place down. I wanted to get it off my chest. He already confessed to me on the site of the burning. And he wouldn't have been able to say otherwise ladies and gentlemen. Who would have been able to say otherwise? But he did not say that because that's not what happened.
During the State's case-in-chief, Brennan testified that he spoke to Dowbak at the scene of the crime and asked Dowbak who could have burned his building. Brennan testified that Dowbak told him that it might have been Elaine Gray or her family. No mention of Barnett was made by Dowbak to Brennan on the night of the fire. Accordingly, Brennan's testimony was offered by the State to rebut Dowbak's story that he *1387 thought Barnett burned the building for revenge.[6] Later, when Dowbak's attorney cross-examined Brennan, he attempted to impeach Brennan's credibility by attempting to show that Brennan was after publicity and would do anything possible, including fabrication of evidence, to see that Dowbak was convicted of arson. In fact, Dowbak's attorney accused Brennan of fabricating statements and attributing them to certain witnesses.
We find that these comments by the State were not a comment on Dowbak's decision not to take the stand. Instead, these statements were comments on Dowbak's defense, i.e., Brennan fabricated statements to insure that Dowbak would be convicted. Dowbak called several witnesses to the stand and none of his witnesses testified that Brennan fabricated false statements. Accordingly, we hold that the prosecutor's argument was designed to show that the defense attorney presented no evidence to demonstrate that Brennan fabricated evidence in order to obtain Dowbak's conviction. Thus, this argument merits Dowbak no relief.
Next, Dowbak claims that the following comments were made in violation of his Fifth Amendment right against self-incrimination:
Ladies and gentlemen likewise, you are told that Dolph Bryan's testimony alone allows you to return a verdict of not guilty. Dolph Bryan, I agree with everything defense counsel said, I do not live in Oktibbeha County. If I did, I would vote for Dolph Bryan. I think he is an excellent sheriff, maybe one of the best in the State. He is an excellent man. He is a good man and his opinion is, indeed, and I believe he believes it truthfully that this man is honest. I believe that, but ladies and gentlemen, have any of you ever been mistaken? Dolph Bryan is indeed just like you, a human being. And we have all been fooled by people before. He is this man's doctor. He is this man's friend and part of our human existence ladies and gentlemen is that we confine our feelings, our emotions, our thoughts, our perceptions of other human being [sic] to our experiences with them. That's it. And we have all been fooled before, each and every one of us. Because Dolph Bryan doesn't know the man, ladies and gentlemen, that Mrs. Peeples knows. It's a different individual altogether. And then ladies and gentlemen, likewise you were told that you are, of course, it is incredible for you to believe that this man who gets this feeling, this warmth, this  this somehow unspeakable feeling of closeness with this community by working on these people, to commit this crime. Ladies and gentlemen, where is the testimony of that? How do you know what John Dowbak feels about working on the people of this community? For all you know all he does is see his patients as dollar signs. You know no better.
Dowbak's attorney argued on closing argument that Dowbak derived a certain feeling of satisfaction from having the people of the community rely on him as their orthopaedic surgeon. In effect, Dowbak's attorney that Dowbak would not commit arson because he respected the community too much and they relied upon him.
Dowbak called five witnesses in his case-in-chief and one witness in surrebuttal. A review of their testimony does not indicate that any of these witnesses testified that Dowbak derived a sense of closeness from the community because he was "their" orthopaedic surgeon. The prosecutor's comment was intended to show that there was no evidence in the record to support Dowbak's attorney's argument. Accordingly, the prosecutor's comments were a valid comment on the lack of evidence to support Dowbak's defense that he would not engage in the crime of arson because Dowbak derived a feeling of satisfaction and closeness from the community as a result of his practice. *1388 Shook, 552 So.2d at 851. Thus, Dowbak merits no relief on this argument.
Finally, Dowbak offers as reversible error the following:
And then ladies and gentlemen you're told, well it's blackmail. That's what they're doing they're blackmailing him. Where's the testimony? Who said that ladies and gentlemen, the lawyers did.
This excerpt comes from a part of the district attorney's closing argument in which he debunks each of Dowbak's defenses. In this specific context the prosecutor argues before the jury that none of Dowbak's witnesses testified that he was being blackmailed by the Barnetts. The record does not indicate any evidence to suggest that Dowbak was being blackmailed by the Barnetts. Dowbak's attorneys argued blackmail as a defense. However, argument is not evidence. Ormond v. State, 599 So.2d 951, 961 (Miss. 1992). Accordingly, the prosecutor's remarks were permissible to illuminate the fact that there was no testimony or evidence to indicate that Barnett was blackmailing Dowbak. Therefore, this comment is a permissible comment by the district attorney on the lack of evidence to support Dowbak's blackmail defense. Shook, 552 So.2d at 851.

IV. THE LOWER COURT ERRED WHEN THE TRIAL JUDGE DID NOT RECUSE HIMSELF WHEN HIS BROTHER-IN-LAW WAS RETAINED BY APPELLANT AT HIS SECOND TRIAL, AND THE LOWER COURT FAILED TO FOLLOW THE PROPER PROCEDURE FOR HANDLING SUCH A CONFLICT AS REQUIRED BY LAW.
Finally, Dowbak argues that his conviction should be reversed because one of his attorneys, James E. Brown, is the trial judge's brother-in-law. Dowbak contends that Montgomery's failure to recuse himself violated Canon 3 C.(1)(d) of the Code of Judicial Conduct. Alternatively, Dowbak contends that Montgomery could have heard the case had he followed the procedure outlined in Canon 3 D. of the Code of Judicial Conduct. Dowbak argues that Montgomery did not properly follow this procedure and therefore, Dowbak requests that this Court reverse his conviction.
Initially, Dowbak was represented by two attorneys, Jim Waide and John Fox. However, before his second trial in Oktibbeha County Circuit Court, Dowbak retained the services of James E. Brown. Dowbak informed the judge that he wished to retain Brown's services in selecting a jury since Dowbak did not know many of the citizens of Oktibbeha County. Judge Montgomery, pursuant to the Canons of Judicial Conduct, informed the parties that Brown was his brother-in-law. Thereafter, Dowbak and his trial attorneys indicated that they did not have any problem with Montgomery serving as the trial judge in spite of the fact that Dowbak was represented in part by Montgomery's brother-in-law. Accordingly, neither Dowbak or his trial attorneys raised an objection to Montgomery serving and all agreed to sign an order allowing for Montgomery's continued service. After his conviction and after his first requests for judgment notwithstanding the verdict or in the alternative, motion for new trial were denied, Dowbak retained the services of Mose Lee Sudduth. Sudduth filed an amended motion for new trial in which he raised for the first time, the issue of Montgomery's service on the trial.
Art. 6, § 165 of the Mississippi Constitution (1890) provides in part:
No judge of any court shall preside on the trial of any cause, where the parties or either of them, shall be connected with him by affinity or consanguinity, or where he may be interested in the same, except by the consent of the judge and of the parties.
(emphasis added).
In the case sub judice, we find that the parties clearly agreed to Montgomery's continued service as the trial judge. In fact, Montgomery asked Dowbak point-blank if he *1389 had any such objection to Montgomery's service and Dowbak indicated that he did not.
Miss. Code Ann. § 9-1-11 (1972) is essentially identical to Art. 6, § 165 except that it also provides that the judge should disqualify himself if he may have been of counsel. That clearly is not the case here. Accordingly, we find that this statutory provision did not prevent Montgomery from presiding over Dowbak's trial.
Whereas Montgomery was not barred by constitutional or statutory provisions from presiding, we must review the recusal issue under Canon 3 C(1)(d)(ii) which provides:
(1) A judge should disqualify himself in a proceeding in which his impartiality might reasonably be questioned, including but not limited to instances where:
(d) he or his spouse, or a person within the third degree of relationship to either of them, or the spouse of such a person:
(ii) is acting as a lawyer in the proceeding.
"[T]he Canon enjoys the status of law such that we enforce it rigorously, notwithstanding the lack of a litigant's specific demand." Green v. State, 631 So.2d 167, 177 (Miss. 1994) (quoting Collins v. Dixie Transport, Inc., 543 So.2d 160, 166 (Miss. 1989)). This Court employs an objective standard to determine if, under Canon 3, a judge should have recused himself. The test for recusal is as follows:
A judge is required to disqualify himself if a reasonable person, knowing all the circumstances, would harbor doubts about his impartiality.
Green, 631 So.2d at 177 (quoting Jenkins v. State, 570 So.2d 1191, 1192 (Miss. 1990)). When a judge is not disqualified from presiding by Art. 6, § 145 or by Miss. Code Ann. § 9-1-11 (1972), "the propriety of his or her sitting is a question to be decided by the judge and is subject to review only in case of manifest abuse of discretion." Green at 177 (quoting Ruffin v. State, 481 So.2d 312, 317 (Miss. 1985)).
Dowbak does not contend that the trial court acted in bad faith or in a dishonest manner. Further, Dowbak admits that he voluntarily agreed to allow Montgomery to serve as trial judge. Nonetheless, Dowbak now contends that the trial court erred first, because the trial judge in trying to be "more fair to the State, ended up being less than fair to Dowbak" allowing the State to commit various errors regarding Lisa Dowbak and second, because the trial court entered into conversations with Dowbak over the agreement to waive the conflict of interest.
In the case sub judice, at Dowbak's request, the jury was not informed that Brown was Montgomery's brother-in-law. Except for the trial judge's refusal to dismiss the indictment against Dowbak because Lisa Dowbak spoke to the Starkville Police Department, Dowbak does not cite any other instance where the trial judge improperly included or excluded evidence in an effort to be "more fair to the State." Therefore, we find that a reasonable person, knowing all of the circumstances laid out previously, i.e., Brown was retained to help Dowbak select the jury and Dowbak agreed to Montgomery's further participation, would not doubt the judge's impartiality in this case. In light of the fact that there was no motion for recusal before Judge Montgomery, we hold that his failure to recuse himself sua sponte was not an abuse of discretion. See, e.g., Green, 631 So.2d at 178. Accordingly, this argument merits Dowbak no relief.
Finally, Dowbak argues that Montgomery could have still presided in this case had the State and Dowbak agreed to such outside the presence of the judge and without any discussions with the judge. See Canon 3(D) of the Judicial Code of Conduct. Dowbak faults the trial judge for having one-to-one discussions with Dowbak and his attorneys as to whether Dowbak wanted Montgomery to recuse himself.
*1390 The process Montgomery employed in the case sub judice, appears to be substantially similar to the procedure approved of by the Massachusetts Court of Appeals in Leatherbee Mortg. Co., Inc. v. Cohen, 37 Mass. App. Ct. 913, 638 N.E.2d 939 (1994). In Leatherbee, it was brought to the trial judge's attention that the defendant had used the judge's husband's law firm on other projects similar to the one being litigated (the judge's husband did not perform legal work on the particular project in litigation). First, the judge disclosed the issue of recusal with the attorneys, who asked that she not recuse herself. The judge then asked to speak to the parties who indicated that they were aware of the connection and did not wish for the judge's recusal. The judge then dictated into the record the disclosure of the potential conflict of interest, and her discussions with counsel and the parties. Thereafter, she added for the record that she was free of any bias as to either party, disinterested in the result, and capable of ruling impartially in the case. Id. 638 N.E.2d at 941.
The defendant in Leatherbee lost and appealed, assigning as error the fact that the trial judge had not complied with Canon 3(D) and gained the attorney's approval in writing as to her continued service in the case. The Leatherbee Court rejected the defendant's formalistic argument and stated:
It may also be said that there is something unseemly in a party urging a judge not to recuse herself, putting his opponent to trial, and, after unpleasant results are in, raising the cry of conflict  this in a situation where the hypothetical conflict favored Cohen (the defendant). The disavowal by counsel and the parties of doubt about the judge's impartiality was memorialized in written form. Only the actual signatures of the lawyers were lacking and neither the parties nor the judiciary should be imposed upon by reason of that purely formal step not having been taken.
Leatherbee at 941.
In the case sub judice, Dowbak brought his Motion To Withdraw as Counsel on the day the re-trial was to begin. The motion sought permission for John Fox to withdraw so that local counsel, Brown, could step in and aid in Dowbak's defense. Never once did Dowbak file any motion seeking Montgomery's recusal. Likewise, neither Dowbak nor his attorney asked Montgomery to recuse himself during the pre-trial hearing. The trial judge disclosed his relationship to Brown on the record and it was determined after talking to Dowbak, the district attorney and Dowbak's attorneys, that the parties would agree to Montgomery's continued handling of the trial. Thereafter, an agreed order was signed by all parties involved.
We find that Montgomery's handling of this matter was proper as contemplated by Canon 3(D). All parties involved agreed in writing to Montgomery's continued participation. Dowbak had three attorneys available to advise him and Dowbak clearly made the decision to allow Montgomery to continue the trial. Accordingly, we find no merit in this argument.

CONCLUSION
The trial judge did not err in refusing to dismiss Dowbak's indictment. Lisa Dowbak did not testify against Dowbak, nor did any witness testify as to her conversations with the Starkville Police Department. Likewise, Dowbak's claim that the district attorney violated the rules of discovery is without merit. Lisa was not an eyewitness to the crime nor was her disclosure necessary to protect Dowbak's constitutional rights. Further, we find that Dowbak's prosecutorial misconduct argument is without merit. The examples cited by Dowbak as comments on his failure to testify, when viewed in their entirety and in context, are comments on Dowbak's defense or comments on the lack of evidence to support a claim made by Dowbak. Finally, we hold that the that the trial judge did not abuse his discretion in presiding over Dowbak's trial. Accordingly, the judgment of the lower court is hereby affirmed.
*1391 CONVICTION OF SECOND DEGREE ARSON AND SENTENCE OF FOUR YEARS IN CUSTODY OF THE MISSISSIPPI DEPARTMENT OF CORRECTIONS AND FINE OF $5,000.00 AFFIRMED.
PRATHER and SULLIVAN, P.JJ., and PITTMAN, BANKS, McRAE, JAMES L. ROBERTS, Jr., SMITH and MILLS, JJ., concur.
NOTES
[1] Prior to living and practicing medicine in Starkville, Dowbak resided in and practiced medicine in Corinth. Dowbak became acquainted with the Barnetts during his time in Corinth.
[2] Grimes was employed by the Mississippi Bureau of Narcotics and Boozer was employed by the Mississippi Highway Patrol.
[3] Evidently the Starkville Police Department routinely records all calls made to and from the building. These tapes are kept for a number of days and are then recorded over.
[4] Debra Dillingham Ross and Jean Barnett visited Dowbak at his clinic before the fire. According to Ross, Dowbak and Barnett got into Barnett's car and drove around town. Barnett testified earlier that she and Dowbak discussed his plan to burn his building during this drive.
[5] One of the nurses at the hospital had drawn a pentagram on Reagan's chart while he was a patient. The State makes a veiled reference to the pentagram during closing argument.
[6] Barnett testified that Dowbak told her after the fire that he and his girlfriend had attempted to contact Jean and Reagan Barnett on the night of May 13, 1991, and stop the plan but that Dowbak arrived too late.