MAXWELL, J., for the Court:
 

 ¶ 1. Johnny Charles Shorter was found guilty of murder in violation of Mississippi Code Annotated section 97-3-19 (Rev. 2006) by a jury in the Circuit Court of Rankin County, Mississippi. He was sentenced to life in the custody of the Mississippi Department of Corrections (MDOC). On appeal, Shorter argues the trial court erred in (1) admitting the 911 call of his divorce attorney, (2) admitting the 911 call of his wife, (3) refusing a manslaughter jury instruction, and (4) failing to grant his motion for a new trial.
 

 ¶ 2. Finding no reversible error, we affirm.
 

 FACTS AND PROCEDURAL HISTORY
 

 ¶ 3. Shorter and his wife, Angelique Shorter, were having marital problems, and Shorter hired attorney Gill Baker to represent him in his divorce proceedings. After the couple separated, Shorter suspected Angelique of becoming romantically involved with another man. One night, while drinking at a local pool hall that he frequented, Shorter ran into Jim Beckman, who Shorter suspected was sleeping with Angelique. Shorter confronted Beckman, but Beckman denied any relationship with her. During their conversation, Shorter told Beckman he believed Angelique was involved with another man named Kenneth Boutwell.
 

 ¶ 4. Later that night, Shorter called his attorney, Baker, and informed Baker of his intention to kill a man. Baker understood that Shorter planned to kill Beckman and promptly called 911. In response to the attorney’s call, the Rankin County Sheriffs Department began searching for Beckman. However, soon after the search began, Angelique called 911 and reported that Shorter had shot Boutwell.
 

 
 *516
 
 ¶ 5. Shortly after the shooting, Shorter phoned his father-in-law, and told him he had just killed a man and was going to smoke a cigarette. Shorter also called his sister and informed her of what he had just done. Shorter then waited at the scene of the shooting until deputies from the sheriffs department arrived and arrested him. After being advised of his
 
 Miranda
 
 rights, Shorter asked one of the deputies, “Is the son of a bitch I shot dead?”
 

 ¶ 6. A jury convicted Shorter of murder, and he was sentenced to life in the custody of the MDOC. Shorter filed a motion for a judgment notwithstanding the verdict or, in the alternative, a new trial, which the circuit court denied.
 

 DISCUSSION
 

 I. Admissibility of Shorter’s Attorney’s 911 Call
 

 ¶ 7. Prior to trial, Shorter filed a motion in limine to exclude the contents of a 911 call from his attorney, Baker, to a dispatcher for the Hinds County Sheriffs Office. After hearing arguments outside the presence of the jury,
 
 [1]
 
 the circuit court held the tape was admissible.
 

 ¶ 8. Shorter argues that this ruling was in error for two reasons. First, he contends the crime-fraud exception to the attorney-client privilege does not apply because he did not seek his attorney’s advice to aid him in the furtherance of a crime. Second, he claims the circuit judge improperly admitted the 911 recording based upon ethical rules,
 
 [2]
 
 rather than an established rule of evidence.
 

 A. Crime-Fraud Exception
 

 ¶ 9. “The application of privilege is properly a mixed question of law and fact, with the circuit court’s factual findings reviewed for clear error and its interpretation of the law reviewed de novo.”
 
 Hewes v. Langston,
 
 853 So.2d 1237, 1241 (¶ 13) (Miss.2003) (citing
 
 United States v. Neal,
 
 27 F.3d 1035, 1048 (5th Cir.1994)).
 

 ¶ 10. Generally, under the attorney-client privilege, a “client has a privilege to refuse to disclose and to prevent any other person from disclosing confidential communications made for the purpose of facilitating the rendition of professional legal services to the client.” M.R.E. 502(b). The privilege belongs to the client rather than the lawyer, and “the lawyer ... at the time of the communication is presumed to have authority to claim the privilege but only on behalf of the client.” M.R.E. 502(c). Our supreme court has stated that the attorney-client privilege is broad, covering
 
 “all information
 
 regarding the client received by the attorney in his professional capacity and in the course of his representation of the client.”
 
 Hewes,
 
 853 So.2d at 1244 (¶ 28). The privilege is a “two-way street,” including “communications made by the client to the attorney and by the attorney to the client.”
 
 Id.
 
 (citation omitted). Additionally, “the privilege does not require the communication to contain purely legal analysis or advice to be privileged.”
 
 Id.
 

 
 *517
 
 ¶ 11. The record before us does not contain any portion of the actual conversation between Shorter and Baker. The only indication of the topics discussed between the two are found in Baker’s subsequent 911 calls. After reviewing the contents of these calls, we find the attorney-client privilege applies to the information Baker chose to reveal. Therefore, our inquiry hinges on whether any applicable exceptions to the attorney-client privilege exist.
 

 ¶ 12. “The importance and sanctity of the attorney-client privilege is well established!, but] the privilege is not worthy of protection ‘at all costs.’ ”
 
 In re Grand Jury Subpoenas v. United States,
 
 144 F.3d 653, 659-60 (10th Cir.1998) (citing
 
 Upjohn Co. v. United States,
 
 449 U.S. 383, 389, 101 S.Ct. 677, 66 L.Ed.2d 584 (1981)). No privilege exists where “the services of the lawyer were sought or obtained to enable or aid anyone to commit or plan to commit what the client knew or reasonably should have known to be a crime or fraud.” M.R.E. 502(d)(1). The policy behind the crime-fraud exception is premised upon the theory that “it would be a perversion of the privilege to extend it to the client who seeks advice to aid him in carrying out an illegal or fraudulent scheme.” McCormick on Evidence § 95, at 164 (Kenneth S. Broun et al. eds., 6th ed. 2006).
 

 ¶ 13. There is no Mississippi case law addressing the specific factual situation before us. However, an Oklahoma appellate court, in a case with very similar facts, has ruled on the applicability of the crime-fraud exception. In
 
 Keller v. State,
 
 651 P.2d 1339, 1341-42 (Okla.Crim.App.1982), the Oklahoma Court of Criminal Appeals found a trial court did not err in allowing two attorneys, in their client’s first-degree-murder trial, to testify about their client’s statements about “getting rid” of the victim. One of the attorneys recounted his client’s statement that “Mr. Busch [the victim] was a dead man and didn’t know it.”
 
 Id.
 
 at 1341. The Oklahoma court held the attorneys’ disclosure of these statements fell within the crime-fraud exception even though they were not sure their client was serious in requesting advice about “getting rid” of the victim.
 
 Id.
 
 at 1341-42. In interpreting Oklahoma’s crime-fraud exception, which contains language identical to Mississippi’s, the Oklahoma Court of Criminal Appeals reasoned:
 

 [I]n order that a communication between a lawyer and his client be privileged, it must be for a lawful purpose, or in furtherance of a lawful end. Accordingly, communications made to counsel prior to the commission of a crime which is contemplated by the so-called client, and in reference to the perpetration thereof, or for the purpose of being guided or assisted therein, are in no sense privileged and the attorney may testify thereto.
 

 Id.
 
 at 1342. The Oklahoma appellate court held that the State had made a prima facie showing that the crime-fraud exception applied; thus, the statements by the defendant to his attorney had “lost their confidential character.”
 
 Id.
 

 ¶ 14. Here, it is undisputed that Shorter called his attorney, Baker, and told Baker that he was about to commit a homicide. Baker, who was acting in accordance with Mississippi’s rules of ethics, chose to disclose this information to law enforcement.
 

 ¶ 15. Baker first called 911 at approximately 1:00 a.m. on September 6, 2007, shortly before Shorter’s wife, Angelique, called 911 about Boutwell being shot. Baker told the 911 dispatcher that he “just got a call from a client who said he was fixin’ to drive about two miles down the road, stick a gun to a man’s head, and kill
 
 *518
 
 him.” Later in the conversation, the police dispatcher asked Baker, “You know what it’s about?” Baker responded, “He [Shorter] was coming to see me about a divorce.” Baker provided law enforcement with Beckman’s name, whom Baker suspected Shorter intended to kill. Baker said he would call back with Beckman’s contact information.
 

 ¶ 16. Shortly thereafter, Baker again called 911, and the following exchange took place:
 

 Baker: I was just speaking with someone out there about a possible murder about to happen.
 

 Baker: Johnny was drunk; he had found out about his wife and Mr. Beckman ... over the last couple days. He was supposed to come see me in the morning about a divorce, and that’s all I know about it.... He said he had nothing to lose.
 

 911 dispatcher: Oh yeah he does.
 

 Baker: Yeah, that’s what I’m trying to convince him.
 

 ¶ 17. From this conversation, we glean that Shorter, whom Baker refers to as his “client,” did not merely tell Baker what he intended to do and then immediately hang up the phone. Rather, the recording depicts that the two had a conversation about Shorter’s proposed actions. While, according to Baker, Shorter contended he had nothing to lose, Baker attempted, albeit unsuccessfully, to persuade Shorter otherwise and to point out the potential consequences of Shorter’s actions.
 

 ¶ 18. Our supreme court has instructed that when a client seeks the attorney’s services to engage in a future crime or fraud, there must be “proof that the crime or fraud actually occurred.”
 
 Hewes,
 
 853 So.2d at 1247 (¶ 40). This burden was undoubtedly met, given the abundant proof that Shorter called his attorney, revealed his intention to commit a murder, and shortly thereafter went through with it.
 

 ¶ 19. Under these circumstances, we find that although the complained of conversation was privileged, the crime-fraud exception applies. Accordingly, the circuit court did not err in admitting Baker’s 911 call under this exception.
 

 B. Waiver of Privilege Based Upon Rules of Professional Conduct
 

 ¶ 20. The circuit judge, as Shorter correctly points out, based his decision in part on the basis that the attorney-client privilege was waived as to the statements in Baker’s 911 call because Baker, pursuant to his ethical duties, properly revealed Shorter’s plans to commit murder. Mississippi Rule of Professional Conduct 1.6 states, in pertinent part, that:
 

 (a) A lawyer shall not reveal information relating to the representation of a client unless the client gives informed consent, the disclosure is impliedly authorized in order to carry out the representation, or the disclosure is permitted by paragraph (b).
 

 (b) A lawyer may reveal such information to the extent the lawyer reasonably believes necessary:
 

 (1) to prevent reasonably certain death or substantial bodily harm[.]
 

 ¶ 21. Shorter argues that the attorney-client privilege cannot be waived by virtue of a rule of ethics and that the circuit judge essentially disregarded the rules of evidence in ruling on the admissibility of the 911 call.
 

 ¶ 22. We find Shorter’s arguments on this issue unpersuasive. The record makes clear that the circuit judge did consider the rules of evidence in addressing the admissibility of Baker’s 911 call. Specifically, as Shorter acknowledges in his brief, the circuit judge stated that “the
 
 *519
 
 Court based it’s [sic] ruling [on the admissibility of Baker’s 911 call] in that instance ... after reviewing Rule 1.6 of the Mississippi [Rules] of Professional Conduct ... and Mississippi Rule[] of Evidence 502, [and] the Court made an analysis of [probative [v]alue versus ... prejudicial effect!.]”
 

 ¶ 23. Although the circuit judge did not use the words “crime-fraud exception,” he did cite Mississippi Rule of Evidence 502, which specifically addresses the crime-fraud exception. He even pointed out that he was, in part, basing his ruling on Mississippi Rule of Evidence 502.
 

 ¶ 24. Since we have determined Baker’s 911 call falls within the crime-fraud exception to the attorney-client privilege, we need not address whether an attorney’s disclosure under Rule 1.6 of the Rules of Professional Conduct also waives the attorney-client privilege.
 

 ¶ 25. Furthermore, due to the substantial evidence of Shorter’s guilt, even if we held the admission of these recordings, or any part of them, was error, we find such error would be harmless. Mississippi Rules of Evidence 103(a) provides: “Error may not be predicated upon a ruling which admits or excludes evidence unless a substantial right of the party is affected!.]” In addition, “[t]o warrant reversal, the error by the trial court must have ‘the effect of denying the defendant a fundamentally fair trial.’ ”
 
 O’Neal v. State,
 
 977 So.2d 1252, 1256 (¶ 19) (Miss.Ct.App.2008) (citation omitted). Here, Shorter received a fundamentally fair trial, and any error in the admission of the recording of his attorney’s 911 call was merely harmless in light of the overwhelming evidence of Shorter’s guilt.
 

 II. Admissibility of Shorter’s Wife’s 911 Call
 

 ¶ 26. Before trial, Shorter filed a second motion in limine to exclude his wife’s statements made during her 911 call. After hearing from both sides, the circuit judge held the recording of Angelique’s 911 call was admissible. Shorter claims this too was error.
 

 ¶ 27. He first contends admission of the recording violated spousal-competency principles. Second, he claims Angelique’s statements from the 911 call were testimonial in nature and their admission violated the Confrontation Clause.
 

 ¶ 28. In determining the relevancy and admissibility of evidence, trial courts enjoy considerable discretion. Their rulings will not be reversed unless there was an abuse of discretion that prejudiced the accused.
 
 Fisher v. State,
 
 690 So.2d 268, 274 (Miss.1996) (citing
 
 Shearer v. State,
 
 423 So.2d 824, 826 (Miss.1982)).
 

 A. Spousal Competency
 

 ¶ 29. Mississippi Rule of Evidence 601(a) provides, in pertinent part, that: “In all instances where one spouse is a party litigant the other spouse shall not be competent as a witness without the consent of both[.]”
 

 ¶ 30. In response to Shorter’s spousal-competency argument, the State cites
 
 Dowbak v. State,
 
 666 So.2d 1377, 1382 (Miss.1996). In
 
 Dowbak,
 
 our supreme court found there was no violation of the husband-wife privilege or spousal-competency principles in the State’s use of the defendant’s wife as a confidential informant against her husband.
 
 Id.
 
 (interpreting spousal-competency statute, Mississippi Code Annotated section 13-1-5 (Supp. 1990), now embodied in Rule 601);
 
 see also
 
 M.R.E. 601 cmt. (Rule 601(a) “retains the substance of superseded M.C.A. § 13 — 1— 5.”). In
 
 Dowbak,
 
 the supreme court rejected the defendant’s argument that all testimony resulting from his wife’s conver
 
 *520
 
 sations with police violated spousal-competency principles, and the court declined to hold that spouses “cannot help law enforcement officers investigate or solve crimes in which their spouse might be involved.”
 
 Dowbak,
 
 666 So.2d at 1382.
 

 ¶ 31. In
 
 Dowbalc,
 
 neither the defendant’s wife nor the officer to whom she had spoken testified at trial.
 
 Id.
 
 at 1381. Similarly, here, Angelique, did not actually testify as a witness in court. However, her 911 recording was played to the jury. While
 
 Dowbalc
 
 is somewhat instructive, we are faced with an issue that was not before the supreme court in that case: whether Rule 601 prevents a spouse’s out-of-court statements from being admitted into evidence.
 

 ¶ 32. Although not cited by either party, we note that our supreme court has held the admission of a spouse’s out-of-court statements may violate spousal-competency principles.
 
 Ford v. State,
 
 218 So.2d 731, 733 (Miss.1969) (interpreting the spousal-competency provision from the former code section, which contained in substance the same language as Rule 601 with an additional provision regarding discovery). In
 
 Ford,
 
 the defendant, Billy Ray Ford, was convicted of attempted murder of the Warren County Sheriff.
 
 Id.
 
 at 732-33. During Ford’s trial, the sheriff was permitted to testify about “telephone conversations initiated by the defendant’s wife wherein she related to him the major details of the plot by her husband and others to take [the sheriffs] life.”
 
 Id.
 
 at 733. The supreme court held that admission of the sheriffs testimony about the wife’s out-of-court statements was reversible error based upon spousal-competency principles.
 
 Id.
 
 at 734. However, we find the present matter distinguishable from
 
 Ford,
 
 and decline to extend spousal-competency rules to bar admission of statements of nontestimonial character.
 

 ¶ 33. In
 
 Ford,
 
 unlike the case at hand, there were no indications that the telephone calls were made under circumstances of an ongoing emergency.
 
 See id.
 
 As explained further below, although Angelique’s out-of-court statements (in the 911 call) were made to law enforcement, her statements cannot be characterized as resembling in-court testimony because they were made during an ongoing emergency. Therefore, we find the circuit court did not violate Rule 601 in admitting Angelique’s 911 recording.
 

 B. Confrontation Clause
 

 ¶ 34. Shorter contends that, under
 
 Crawford v. Washington,
 
 541 U.S. 36, 124 S.Ct. 1354, 158 L.Ed.2d 177 (2004) and its progeny, admission of Angelique’s 911 recording violated the Confrontation Clause of the United States Constitution. We review de novo an assignment of error based on the Confrontation Clause.
 
 Smith v. State,
 
 986 So.2d 290, 296 (¶ 18) (Miss.2008) (citation omitted).
 

 ¶ 35. The Confrontation Clause provides: “In all criminal prosecutions, the accused shall enjoy the right ... to be confronted with the witnesses against him[.]” U.S. Const, amend. VI. The purposes underlying the Confrontation Clause include:
 

 (1) insuring] that the witness will give his statements under oath — thus impressing him with the seriousness of the matter and guarding against the lie by the possibility of a penalty for perjury; (2) forcing] ... witnesses] to submit to cross-examination, the greatest legal engine ever invented for the discovery of truth; [and] (3) permitt[ing] the jury that is to decide the defendant’s fate to observe the demeanor of the witness making his statement, thus aiding the jury in assessing his credibility.
 

 
 *521
 

 Smith,
 
 986 So.2d at 296 (¶ 19) (quoting
 
 Lee v. Illinois,
 
 476 U.S. 530, 540, 106 S.Ct. 2056, 90 L.Ed.2d 514 (1986)) (internal quotation marks omitted).
 

 ¶ 36. The Confrontation Clause applies to both in-court and out-of-court statements that “bear testimony.”
 
 See Crawford,
 
 541 U.S. at 50-51, 124 S.Ct. 1354. In
 
 Crawford,
 
 the United States Supreme Court defined “testimony” as “a solemn declaration or affirmation made for the purpose of establishing or proving some fact,” and explained that “[a]n accuser who makes a formal statement to government officers bears testimony in a sense that a person who makes a casual remark to an acquaintance does not.”
 
 Id.
 
 at 51, 124 S.Ct. 1354. In addition, the Court observed: “Involvement of government officers in the production of testimony with an eye toward trial presents unique potential for prosecutorial abuse.”
 
 Id.
 
 at 56 n. 7, 124 S.Ct. 1354.
 

 ¶ 37. The
 
 Crawford
 
 Court held that when an out-of-court statement is testimonial, it is inadmissible unless the person who made the statement is unavailable to testify
 
 and
 
 the defendant had a prior opportunity to cross-examine such person.
 
 [3]
 

 Id.
 
 at 53-54, 124 S.Ct. 1354. Although the
 
 Crawford
 
 decision did not fully define “testimonial,” the Supreme Court held that “[w]hatever else the term covers, it applies at a minimum to prior testimony at a preliminary hearing, before a grand jury, or at a former trial; and to police interrogations.”
 
 Id.
 
 at 68, 124 S.Ct. 1354.
 

 ¶ 38. In
 
 Davis v. Washington,
 
 547 U.S. 813, 126 S.Ct. 2266, 165 L.Ed.2d 224 (2006), the United States Supreme Court elaborated on the definition of “testimonial” in the context of police interrogations. The
 
 Davis
 
 Court held that a statement is testimonial “when the circumstances objectively indicate that there is no ... ongoing emergency, and that the primary purpose of the interrogation is to establish or prove past events potentially relevant to later criminal prosecution.”
 
 Id.
 
 at 822, 126 S.Ct. 2266. Furthermore, a statement is nontestimonial when “made in the course of police interrogation under circumstances objectively indicating that the primary purpose of the interrogation is to enable police assistance to meet an ongoing emergency.”
 
 Id.
 

 ¶ 39.
 
 Davis
 
 was the consolidation of two companion cases.
 
 Id.
 
 at 817, 819, 126 S.Ct. 2266. The first case,
 
 Davis v. Washington,
 
 No. 05-5224, involved a 911 call.
 
 Id.
 
 at 817, 126 S.Ct. 2266. In
 
 Davis,
 
 the victim, describing what had just happened with her former boyfriend, told the police dispatcher: “He’s here jumpin’ on me again,” and “[h]e’s usin’ his fists.”
 
 Id.
 
 at 817, 126 S.Ct. 2266. During the course of the conversation, the victim explained that the former boyfriend had “just [run] out the door.”
 
 Id.
 
 at 818, 126 S.Ct. 2266. The police arrived on the scene within four minutes of the 911 call, and they observed the victim in a very shaken state with injuries to her face and forearm.
 
 Id.
 

 ¶ 40. The second case,
 
 Hammon v. Indiana,
 
 No. 05-5705, also involved a domestic disturbance, but not a 911 call.
 
 See id.
 
 at 819, 126 S.Ct. 2266. The police responded to a “reported domestic disturbance” at the home of an alleged victim and attacker.
 
 Id.
 
 When the police arrived, the victim was on the porch and appeared “somewhat frightened,” but nevertheless, she told the officer “nothing was the mat
 
 *522
 
 ter.”
 
 Id.
 
 She allowed the police to enter the house, and once inside, the officers saw a gas-heating unit surrounded by broken pieces of glass.
 
 Id.
 
 Her husband was in the kitchen, and the police kept him separated from her, despite his efforts to participate in her conversation with the police.
 
 Id.
 
 at 819-20, 126 S.Ct. 2266. After hearing the alleged victim’s account, the interviewing officer had her execute an affidavit, which was later admitted at trial.
 
 Id.
 
 at 820, 126 S.Ct. 2266. Therein, she accused her husband of hitting her, shoving her down on the floor into broken glass, and attacking her daughter.
 
 Id.
 

 ¶ 41. The Supreme Court held that the statements in
 
 Davis,
 
 No. 05-5224, were nontestimonial because an ongoing emergency was taking place, while the statements in
 
 Hammon,
 
 No. 05-5705, were testimonial because there was no such emergency.
 
 Id.
 
 at 828-30, 126 S.Ct. 2266. In
 
 Davis,
 
 No. 05-5224, the Supreme Court emphasized that the victim was seeking help, and the statements did not even resemble in-court testimony.
 
 Id.
 
 at 828, 126 S.Ct. 2266. However, in
 
 Hammon,
 
 No. 05-5705, the Court emphasized that the “interrogation was part of an investigation into possibly criminal
 
 past
 
 conduct.”
 
 Id.
 
 at 829, 126 S.Ct. 2266 (emphasis added). The Court noted there was no existing threat to the alleged victim at the time of her interrogation, and the law enforcement officer “was not seeking to determine (as in Davis) “what is happening,’ but rather ‘what happened.’”
 
 Id.
 
 at 830, 126 S.Ct. 2266.
 

 ¶42. The
 
 Davis
 
 Court also explained that statements may be partially testimonial. In that event, trial courts are instructed to “redact or exclude the portions of any statement that have become testimonial[.]”
 
 Id.
 
 at 829, 126 S.Ct. 2266. For example, the
 
 Davis
 
 Court noted, but did not decide, that part of the 911 call in
 
 Davis,
 
 No. 05-5224, may have been testimonial, since the call continued after the former boyfriend left the premises.
 
 Id.
 

 ¶ 43. Here, it is clear that Angelique’s statements were nontestimonial. Angelique’s statements were given to police under circumstances very similar to the 911 call in
 
 Davis,
 
 No. 05-5224, and under far different circumstances than the battery affidavit at issue in
 
 Hammon,
 
 No. 05-5705.
 

 ¶ 44. At the beginning of her 911 call, Angelique told the police that someone had been shot. She then identified the victim as Boutwell, and the person who had shot Boutwell as Shorter. When asked if the victim was still alive, Angelique said “no,” but then she paused and said, “yes, barely.” Then, the following exchange occurred:
 

 911 Dispatcher: Has your husband left the scene?
 

 Angelique: No
 

 911 Dispatcher: He’s still there?
 

 Angelique: Yes, he is.
 

 911 Dispatcher: OK
 

 Angelique: I have a child here. Please send somebody immediately.
 

 911 Dispatcher: OK, we’re sending somebody out there. The questions I’m asking you aren’t slowing them down any, OK.
 

 Angelique: OK.
 

 ¶ 45. Toward the very end of the conversation, Angelique reported to the dispatcher that Boutwell had just died. Though she stated Shorter was not threatening to hurt her or her child, the record is clear that Shorter continued to remain in the house with Angelique during the call. Even after the 911 call had ended, when the law enforcement officers arrived, Angelique was still “shaking” and “distraught,” according to trial testimony.
 

 
 *523
 
 ¶ 46. Under these circumstances, taking into account the Supreme Court’s explanation of the testimonial/nontestimonial distinction in
 
 Davis,
 
 we find that there was an ongoing emergency taking place when the statements were made.
 
 Davis,
 
 547 U.S. at 817-18, 822, 126 S.Ct. 2266. A man who had been shot, Boutwell, was barely alive, and the armed gunman who had pulled the trigger, Shorter, continued to remain in the house with Angelique and her child. Furthermore, Shorter shot Boutwell because he believed he was having an affair with his wife, Angelique, and Shorter was still on the premises at the time of Angelique’s 911 call. There is nothing in the record to establish involvement by the State to produce testimony with an eye toward trial. Rather, Angelique was clearly describing present events, and she was seeking help. Therefore, her statements to law enforcement were nontestimonial, and
 
 Crawford's
 
 requirements of witness unavailability and a prior opportunity for cross-examination are not implicated. Unlike
 
 Hammon,
 
 No. 05-5705, here, the police had not yet responded, diffused the situation, and secured the scene.
 

 ¶ 47. Assuming for the sake of argument that admission of Angelique’s 911 call, or part of it, violated the Confrontation Clause, any such violation was harmless. Even if the very end of Angelique’s 911 call is deemed testimonial, the vast majority of the recording, containing virtually all of the evidence damaging to Shorter’s case, is clearly nontestimonial under
 
 Davis.
 

 ¶ 48. As the Supreme Court has said, a criminal defendant is “entitled to a fair trial but not a perfect one, for there are no perfect trials.”
 
 Brown v. United States,
 
 411 U.S. 223, 231-32, 93 S.Ct. 1565, 36 L.Ed.2d 208 (1973) (citation and internal quotation marks omitted). The Supreme Court has also “repeatedly reaffirmed the principle that an otherwise valid conviction should not be set aside if the reviewing court may confidently say, on the whole record, that the constitutional error was harmless beyond a reasonable doubt.”
 
 Delaware v. Van Arsdall,
 
 475 U.S. 673, 681, 106 S.Ct. 1431, 89 L.Ed.2d 674 (1986). Even violations of the Constitution are subject to harmless-error analysis, and, in fact, “most constitutional errors can be harmless.”
 
 Neder v. United States,
 
 527 U.S. 1, 8, 119 S.Ct. 1827, 144 L.Ed.2d 35 (1999);
 
 see also Smith,
 
 986 So.2d at 302 (¶ 37) (holding that a Confrontation Clause violation constituted harmless error).
 

 ¶ 49. In the present case, even if Angelique’s 911 call had been suppressed, the evidence of Shorter’s guilt is abundant. Such evidence includes Baker’s 911 call to warn that Shorter was about to murder someone, Shorter’s confessions after committing the crime to both his father-in-law and his sister, and Shorter’s questioning one of the officers about whether the “son of a bitch” he had shot was dead. There was also physical evidence matching Shorter’s weapon to the projectiles found in Boutwell’s body, which further established Shorter’s guilt. Although we find the circuit court did not violate the Confrontation Clause by admitting the contents of Angelique’s 911 call since it was nontestimonial in nature, even assuming a violation occurred, the error was at most harmless.
 

 III. The Manslaughter Instruction
 

 ¶ 50. Shorter argues the homicide was committed in the heat of passion, and the circuit court erred in refusing a manslaughter instruction.
 

 ¶ 51. Manslaughter is defined as the “killing of a human being, without malice, in the heat of passion, but in a cruel or unusual manner, or by the use of a dangerous weapon, without authority of law, and
 
 *524
 
 not in necessary self-defense....” Miss.Code Ann. § 97-3-35 (Rev.2006).
 

 ¶ 52. A manslaughter instruction should be given only when the facts developed in the case support the instruction.
 
 Simmons v. State,
 
 805 So.2d 452, 473 (¶30) (Miss.2001) (citation omitted);
 
 see also Turner v. State,
 
 773 So.2d 952, 954 (¶¶ 6-7) (Miss.Ct.App.2000). “Denial of a manslaughter instruction is proper where the record is clear that the decedent was shot with malice or deliberate design.” Id at 474 (¶ 32) (citation omitted).
 

 ¶ 53. Shorter conducted his own investigation to find out who was having sexual relations with his wife. After identifying Boutwell as the one having the affair, Shorter proceeded to Boutwell’s house armed with a .38-caliber pistol. Before Shorter arrived, he phoned his attorney and informed him of his intention to kill someone. The record also indicates that at the time of the shooting Boutwell was unarmed and smoking a cigarette.
 

 ¶54. Because there is abundant evidence that the killing at issue was done with deliberate design, the circuit court did not err in refusing Shorter’s manslaughter instruction.
 

 IV. Weight of the Evidence
 

 ¶ 55. When reviewing a trial court’s denial of a motion for a new trial based upon an objection to the weight of the evidence, we weigh the evidence in the light most favorable to the verdict and “will only disturb a verdict when it is so contrary to the overwhelming weight of the evidence that to allow it to stand would sanction an unconscionable injustice.” Bush
 
 v. State,
 
 895 So.2d 836, 844 (¶ 18) (Miss.2005) (citation omitted). “[T]he power to grant a new trial should be invoked only in exceptional cases in which the evidence preponderates heavily against the verdict.”
 
 Id
 
 (quoting
 
 Amiker v. Drugs for Less, Inc.,
 
 796 So.2d 942, 947 (¶ 18) (Miss.2000)).
 

 ¶ 56. As thoroughly discussed throughout this opinion, the jury was presented with overwhelming evidence of Shorter’s guilt. Viewing the evidence in the light most favorable to the verdict, we cannot say that allowing the verdict to stand would sanction an unconscionable injustice. Accordingly, this issue is without merit.
 

 ¶ 57. THE JUDGMENT OF THE RANKIN COUNTY CIRCUIT COURT OF CONVICTION OF MURDER AND SENTENCE OF LIFE IN THE CUSTODY OF THE MISSISSIPPI DEPARTMENT OF CORRECTIONS IS AFFIRMED. ALL COSTS OF THIS APPEAL ARE ASSESSED TO RANKIN COUNTY.
 

 KING, C.J., LEE AND MYERS, P.JJ., IRVING, GRIFFIS, BARNES, ISHEE, ROBERTS AND CARLTON, JJ., CONCUR.
 

 [1]
 

 . Although the circuit judge did not hold an in-camera review, he heard arguments from both sides as to the admissibility of the recordings. After asking defense counsel if the parties had “summed up" the contents of the recording and receiving an affirmative response, the circuit judge made his ruling without reviewing the recordings. On appeal, Shorter does not challenge the circuit judge's decision not to listen to the content of the recordings before admitting them into evidence.
 

 [2]
 

 . Specifically, the circuit judge based his ruling on the admissibility of the 911 call in part on Rule 1.6 of the Mississippi Rules of Professional Conduct.
 

 [3]
 

 . Conversely, nontestimonial hearsay falls outside the scope of the Confrontation Clause, but still "is subject to evidentiary rules concerning reliability.”
 
 Smith,
 
 986 So.2d at 296-97 (¶ 20) (citing
 
 Crawford,
 
 541 U.S. at 68, 124 S.Ct. 1354);
 
 see also Davis v. Washington,
 
 547 U.S. 813, 823-24, 126 S.Ct. 2266, 165 L.Ed.2d 224 (2006).