GRIFFIS, P.J.,
for the Court:
¶ 1. Matthew Miller was convicted of the aggravated assault and forcible rape of Abby,[1] his girlfriend’s sixteen-year-old daughter. Miller was sentenced to twenty years for the assault and thirty years for the rape, all in the custody of the Mississippi Department of Corrections. The sentences were ordered to be served consecutively. Miller appeals from that judgment, raising five issues. Finding no reversible error, we affirm.
FACTS
¶ 2. On the evening of January 27, 2008, a Sunday, Miller and Abby were alone at Abby’s mother’s home. Miller had been staying in the home for about eight years. Abby regarded Miller as her stepfather. That night, he asked her to help him capture a horse that had gotten away. Abby agreed, and they left in Miller’s vehicle, a Ford Explorer.
¶ 8. After a brief stop at his mother’s house, Miller drove Abby to an isolated area near his grandmother’s house, off Newman Road in Hinds County, Mississippi. Miller became silent. He left the road, cut off the lights, and turned the vehicle around so it faced the road. Miller got out, and Abby followed. She began to doubt that Miller was really looking for a horse. Abby sent her aunt the following text message: “I’m in a[sic] dark woods with Matthew like where his grandma stays just in case something happens.”
¶4. Shortly thereafter, Miller struck Abby on the top of the head, from behind, with a 2x4 he kept in his vehicle to hold its hatch open. Abby was taken by surprise, and she was dazed by the blow. When she recovered, she heard Miller yelling at her and acting “crazy.” She cried and tried to talk to him, but he hit her again, this time in her jaw with his fist. Miller told Abby to “shut up” and took her cell phone. Eventually, Miller told Abby he was afraid he would get in trouble for hitting her, and he said she would have to prove she would not tell her mother.
¶ 5. Miller then gestured to Abby’s breasts. She understood this as a command to expose herself to him, which she obeyed. Miller said that was not enough, and Abby began crying again. Miller opened the door of his vehicle and told Abby sit on the edge of the seat. She complied. Miller then pointed to Abby’s groin and threatened to kill her. Miller told Abby to “hurry up,” and she pulled down her pajama bottoms. Miller then *1159 stood between Abby’s legs and had sex with her.
¶ 6. After Miller finished, he gave Abby a towel and told her to clean herself up, while he cleaned himself and her blood from the vehicle. Abby surreptitiously threw her towel onto the branches of a nearby tree, hoping someone would find it if she did not survive.
¶ 7. Miller began acting nervous. He told Abby he would leave her in the woods and that she should tell her mother she had been kidnapped. Abby was bleeding from her head and needed medical attention, so she said that would not work. Miller then let her back inside the vehicle. He began driving, but Abby realized Miller was taking them further away from home. She suspected he intended to kill her, so when Miller slowed the vehicle to round a curve, Abby jumped out and ran to a nearby house. Miller pursued, but the owners let Abby inside and alerted the authorities. Miller drove past the home a few times and left.
¶ 8. After Miller was arrested, he gave a statement to Hinds County Sheriffs Department. Miller admitted he had struck Abby with the board, but he could not explain why. He claimed they had mutually agreed to have sex to ensure Abby would not tell her mother he had hit her, as he would have something on her too. Miller denied the sex had been a rape.
¶ 9. At trial, Miller’s theory of the case was that Abby falsely accused him of rape to get back at her mother, who would not let Abby have boys over. In his testimony, Miller again claimed they had consensual sex, but he denied ever striking Abby. Instead, Miller contended that Abby had propositioned him and had been injured when she suddenly leapt from his vehicle.
¶ 10. Miller was convicted and sentenced. From this judgment, Miller appeals.
DISCUSSION
1. Recusal
¶ 11. Miller argues the trial judge erred in denying his ore tenus motion for the judge’s recusal, made four days before the trial. Miller claimed that Judge Malcolm Harrison must recuse himself because, before his appointment to the circuit court, Judge Harrison had served as the Hinds County prosecuting attorney. In that capacity Judge Harrison had appeared as a youth court prosecutor in the shelter hearing where Abby was removed from her mother’s care.
¶ 12. Miller’s argument on appeal has two distinct prongs. The first asserts an express ground for disqualification — the contention that because Judge Harrison held the position of Hinds County prosecuting attorney at the time of Miller’s indictment, he was required to disqualify himself from presiding over the trial. The second is more broadly addressed to all the circumstances of the case.

A. Express Disqualification

¶ 13. Mississippi Code Annotated section 9-1-11 (Rev.2002) forbids a judge from presiding “on the trial of any cause ... wherein he may have been of counsel, except by the consent of the judge and of the parties.” Likewise, the Mississippi Code of Judicial Conduct Canon 3(E)(1)(b) states: “Judges should disqualify themselves in proceedings in which ... the judge served as lawyer in the matter in controversy, or a lawyer with whom the judge previously practiced law served during such association as a lawyer concerning the matter[J” Miller contends that the youth court action and Miller’s criminal prosecution were the same matter.
¶ 14. “The term ‘matter’ includes any judicial or other proceeding, application, request for a ruling or other determination, contract, claim, controversy, inves *1160 tigation, charge, accusation, arrest[,] or other particular matter involving a specific party or parties.” James v. Mississippi Bar, 962 So.2d 528, 534 (¶ 23) (Miss.2007) (quoting M.R.P.C. 1.11(d)(1)). It “seems to contemplate a discrete and isolatable transaction or set of transactions between identifiable parties.” ABA Formal Op. 342 (1975). Thus, two cases are the “same matter” when they involve the same parties, the same issues, and the same concerns. James, 962 So.2d at 534 (¶ 26).
¶ 15. The youth court action was initiated following the alleged assault and rape in the incident underlying Miller’s charges in the instant case. Miller points to a shelter order from the Hinds County Youth Court, which was entered on February 8, 2008, about ten days after the rape. The order recited that a shelter hearing had been held and that Judge Harrison had appeared as the youth court prosecutor, representing the State. Legal custody of Abby was awarded to the Mississippi Department of Human Services, with physical custody entrusted to her grandparents. The shelter order also recited that a no-contact order would be filed against Miller as the “alleged perpetrator,” and it instructed law enforcement and DHS to continue their investigations. Miller also produced an invoice for some of Abby’s medical records that had been billed to Judge Harrison, apparently when he was acting in his capacity as youth court prosecutor. This is the extent of Judge Harrison’s participation in the youth court case that is shown in the record.
¶ 16. In his motion, Miller contended that Judge Harrison’s participation in the youth court proceeding required his recu-sal from the criminal trial. Judge Harrison responded as follows:
[According to the Youth Court Act, everything that happens in youth court is of a civil jurisdiction, not criminal. Therefore, there would be no prosecution in civil court. [I]n my participation as ten years as the county prosecuting attorney in Hinds Countyt,] I am aware that what are called the abuse and neglect hearings are held for the sole purpose of determining what is in the best interest of the victim. There is no prosecution in youth court of any alleged perpetrator. So, therefore, these matters would not be the same. They would not be similar. This matter ... would deal solely with the victim and not with the defendant at all.
¶ 17. It is clear that Miller — because he had no right to custody of Abby — was not a party to the youth court proceeding. However, for the purposes of disqualification, “matter” can include an “investigation, charge, accusation, arrest[,] or other particular matter involving a specific party or parties.” Put another way, the rule is “[wjhere one actively engages in any way in the prosecution and conviction of one accused of a crime, he is disqualified from sitting as a judge in any matter which involves that conviction.” Banana v. State, 638 So.2d 1329, 1330 (Miss.1992).
¶ 18. Miller relies on Jenkins v. State, 570 So.2d 1191 (Miss.1990) to advance this argument. In Jenkins, the Mississippi Supreme Court held that a trial judge erred by not disqualifying himself when he had previously served as county prosecuting attorney and had “acted as a prosecutor during the indictment of Jenkins.” Id. at 1193. Miller also suggests that Jenkins required Judge Harrison to recuse himself solely because he held the office of county prosecuting attorney.
¶ 19. Miller’s reliance on Jenkins is misplaced. While there is some language in Jenkins suggesting the judge had erred because he had simply held the office of county prosecuting attorney at the time of the indictment, the supreme court has elaborated on the holding in subsequent *1161 decisions. In Banana v. State, 638 So.2d 1329, 1330 (Miss.1992), a decision rendered two years after Jenkins, the Supreme Court stated that disqualification is required “[w]here one actively engages in any way in the prosecution.” (emphasis added) (quoting Moore v. State, 573 So.2d 688, 689 (Miss.1990)). The Banana court noted that the judge in Jenkins was “the prosecuting attorney who indicted Jenkins.” Id. This is consistent with the general rule in other jurisdictions. See 48A C.J.S. Judges § 262 (2004) (“In order to disqualify a judge from presiding at a criminal trial on the ground of having been of counsel for the prosecution, the judge must have participated in the preparation of the case.”)
¶ 20. In the present case, Judge Harrison served as the county prosecutor for Hinds County at the time of Miller’s arrest and indictment. However, Miller’s criminal prosecution was handled by the district attorney’s office, not the county prosecutor. And while it is true that Judge Harrison did represent the State in the youth court proceedings, it has not been shown that this amounted to active participation in Miller’s prosecution.
¶ 21. We conclude that Judge Harrison did not serve as a lawyer in the matter in controversy, nor has it been shown that he actively participated in Miller’s prosecution.

B. The “Reasonable Person” Test

¶ 22. For the purposes of this argument, Miller does not contend that Judge Harrison’s actions as the youth court prosecutor require disqualification under the express provisions of the code of judicial conduct, statute, or the Mississippi Constitution. Instead, Miller contends that Judge Harrison’s service as youth court prosecutor at the shelter hearing would cause a reasonable person to doubt his objectivity when presiding over the criminal trial. Miller argues that as the youth court prosecutor, Judge Harrison would have represented the State with the purpose of protecting Abby’s best interest. To that end, Judge Harrison would have had to investigate the allegations and would have presented a case to the youth court at the shelter hearing that probable cause existed that Abby had, in fact, been assaulted and raped. According to Miller, this would cause a reasonable person to doubt Judge Harrison’s objectivity presiding over the criminal trial.
¶23. The Mississippi Supreme Court has outlined our law on judicial recusal as follows:
The law surrounding the recusal of a judge in Mississippi is well settled. Under Canon 3 of the Code of Judicial Conduct, an appellate court, in deciding whether a judge should have disqualified himself from hearing a case uses an objective standard. A judge is required to disqualify himself if a reasonable person, knowing all the circumstances, would harbor doubts about his impartiality. The decision to recuse or not to recuse is one left to the sound discretion of the trial judge, so long as he applies the correct legal standards and is consistent in the application. This Court presumes that a trial judge is qualified and unbiased, and this presumption may only be overcome by evidence which produces a reasonable doubt about the validity of the presumption. When a judge is not disqualified under the constitutional or statutory provisions[,] the decision is left up to each individual judge and is subject to review only in a case of manifest abuse of discretion.
Tubwell v. Grant, 760 So.2d 687, 689 (¶ 7) (Miss.2000) (internal citations and quotations omitted).
¶ 24. It is helpful to examine what a shelter hearing is and what the State must prove. The shelter hearing must be held *1162 before a child can be held for longer than temporary custody (generally, forty-eight hours). See Miss.Code Ann. §§ 43-21-301, -303, -307, -309 (Rev.2009). At the shelter hearing, the youth court must determine whether there is probable cause that the youth court has jurisdiction and that custody is necessary. Miss.Code Ann. § 43~21-309(4)(a); U.R.Y.C.P. 16. Custody is necessary: “(1) when a child is endangered or any person would be endangered by the child; or to insure the child’s attendance in court at such time as required; or when a parent, guardian or custodian is not available to provide for the care and supervision of the child; and (2) there is no reasonable alternative to custody.” U.R.Y.C.P. 16(a)(4)(ii); Miss.Code Ann. § 43 — 21—301(3)(b). The youth court must also find:
the effect of the continuation of the child’s residing within the child’s own home would be contrary to the welfare of the child; the placement of the child in foster care is in the best interest of the child; and, unless the reasonable efforts requirement is bypassed under section 43-21-603(7)(c) of the Mississippi Code: (1) reasonable efforts have been made to maintain the child within his own home, but that the circumstances warrant his removal and there is no reasonable alternative to custody; or (2) the circumstances are of such an emergency nature that no reasonable efforts have been made to maintain the child within his own home, and there is no reasonable alternative to custody.
U.R.Y.C.P. 16(b)(4)(iii); Miss.Code Ann. § 43-21-309. The shelter hearing also features relaxed rules of evidence. All parties present may present evidence and cross-examine witnesses, but the youth court may limit the extent of both. Miss. Code Ann. § 43-21-309. Evidence may be accepted without regard to the formal rules of evidence; hearsay and opinion testimony may be heard. Id. Testimony may be presented in narrative form. Id.
¶ 25. In summary, the youth court shelter hearing is a civil action. The youth court prosecutor represents the State, not the victim; she was represented by her own attorney at the hearing. Miller was not a criminal defendant in the youth court, nor even a party. The hearing permitted relaxed rules of evidence, including hearsay; the shelter order reflects that the victim was not present at the hearing and did not testify there. Instead, it appears that testimony to advance the State’s case was offered by two DHS employees. The burden of proof for the State was only probable cause, and the contested issues, if there were any, likely related not to whether probable cause existed that Abby had been assaulted and raped, but whether it was in her best interest to be removed from her mother’s home until an adjudicative hearing could be held. All of these facts support the conclusion that Judge Harrison was not necessarily so involved in the case as to require his disqualification.
¶ 26. Our analysis of this issue is complicated by the limited record. While we know that Judge Harrison appeared at the shelter hearing and had requested some of Abby’s medical records, Miller offered no other evidence of his participation in the youth court case. Miller attributes this to the confidentiality of the youth court records, but he could have just asked Judge Harrison to elaborate on the extent of his personal participation in the case. Miller did not, and in our review we are limited to the facts shown in the record before us.
¶ 27. Miller asks us to speculate about what Judge Harrison could have done: he could have had more personal involvement in the case than is shown by the record, or he might have even personally participated in the investigation to the extent he could *1163 be said to have taken an active role in Miller’s prosecution. We concede this is possible, but the record is silent on the extent of Judge Harrison’s personal participation in the case.
¶ 28. There is a presumption of impartiality. A trial judge is presumed to be qualified and unbiased. Tubwell, 760 So.2d at 689 (¶ 7). The presumption can only be overcome by evidence that produces a reasonable doubt about its validity. Id. In order to reverse the trial judge’s decision not to recuse himself, there must be a manifest abuse of discretion — that is, the error must be clearly shown by the record. Id. A presumption cannot be overcome by the absence of evidence, particularly where it results from the appellant’s failure to make a record. A trial judge cannot be disqualified by speculation.
¶29. Miller also argues that various erroneous rulings by the trial judge evidenced a bias against him. He assigns these rulings as separate issues on appeal, which we address below.
¶ 30. Judge Harrison’s denial of the disqualification motion has not been shown to be an abuse of discretion. The presumption of his impartiality has not been overcome. We find that this issue is without merit.
2. Continuance
¶ 31. Next, Miller argues that the trial court erred in not granting a continuance for further testing of his mental capacity to voluntarily give a statement to the investigating officers. Miller gave the statement on January 28, 2008, and made numerous damaging admissions. More than two years later, on February 25, 2010, Miller made an amended motion to suppress the statement. In the amended motion, Miller contended that the statement was not voluntarily given because, among other things, he is mentally retarded. This was the first time Miller had made that claim. At the same time, Miller made a separate motion for a continuance, asking for more time to evaluate his mental capacity. After a hearing held the next day, both motions were denied. The trial began on March 1, 2010, as scheduled.
¶ 32. Miller’s presentation of this issue is somewhat confusing. Miller contends the trial court should have granted a continuance so he could collect evidence concerning the voluntariness of his statement, but he cites to Uniform Rule of Circuit and County Court 9.06 and Mississippi Code Annotated section 99-13-11 (Rev.2007) among his authorities. These provisions concern court-ordered examinations to test for competency to stand trial. The record reveals that Miller has not argued — in the trial court or on appeal — that he was incompetent to stand trial. Instead, he sought a continuance so he could be evaluated by his own expert, to the ultimate end of showing that the statement was not given knowingly and voluntarily. Although Miller never claimed he was incompetent to stand trial, the trial judge did appear to be concerned about his competency, asking several questions and making findings addressing that issue. It could be said that the trial court took Miller’s motion for a continuance as also alleging that he was incompetent to stand trial, but Miller has not made that argument on appeal. Therefore, we review this issue as Miller has framed it: whether the trial court erred in denying Miller’s motion for a continuance.
¶ 33. In support of his motion for a continuance, Miller’s attorneys stated they had recently come to believe that Miller was mentally retarded. During the course of their representation, the attorneys had repeatedly asked Miller about the statement he gave to law enforcement. Miller *1164 had always denied ever making such a statement.
¶ 34. On December 16, 2009, after a series of discovery disputes, the State produced a copy of the audio recording of the statement. On February 22, 2010, Miller’s attorneys confronted him with the recording, and his reaction caused them to doubt his mental competency. While the tape was played, Miller had a “blank look,” and he claimed he did not remember giving a statement. The attorneys stated that Miller appeared to “not know what [they were] talking about,” and they decided Miller needed to have his intelligence evaluated. With the trial scheduled to begin in a week, Miller only had time for preliminary evaluations. Lucy DeRossette, a psychometrist with a background in education, administered two tests, the Schubert General Ability Test and the Slosson Full-Range Intelligence Test. Miller’s scores placed him in the 17th and 14th percentiles, respectively. At the motion hearing, Miller offered an affidavit from DeRossette stating the test results, as well as an unsworn letter detailing her observations of Miller. The letter stated that Miller had dropped out of high school in the tenth grade.[2] He could not read well and showed signs of “being more of an auditory and tactile learner,” who “needs things clearly explained to him and ... repeated often.”
¶ 35. DeRossette did not testify at the motion hearing. Miller instead offered Dr. Angela Koestler, a psychologist, who testified that although she had not examined Miller, the preliminary test results reported by the psychometrist indicated Miller could be mentally retarded. Koestler opined that further testing was warranted by the preliminary results. She also stated that someone who was mentally retarded may nonetheless have learned to hide his deficiency, explaining why Miller’s attorneys might not have suspected diminished intelligence through almost two years of representation. Miller’s attorneys added that Miller had said little during their trial preparations. He had always been accompanied by family members, who the attorneys had interacted with more than with Miller himself.
¶ 36. The trial court denied the motion, noting that Dr. Koestler had not examined Miller, Miller had been released on bond and represented by counsel for nearly two years, and continuances had already been granted to the defense. The court also eventually denied Miller’s motion to suppress his statement, which was admitted into evidence, and Miller testified in his own defense at the trial.
¶ 37. “The decision to grant or deny a continuance is left to the sound discretion of the trial court.” Stack v. State, 860 So.2d 687, 691 (¶ 7) (Miss.2003) (citations omitted). We will not reverse a trial court’s decision to deny a motion for continuance unless the decision appears to have resulted in manifest injustice. Mosely v. State, 4 So.3d 1069, 1073-74 (¶9) (Miss.Ct.App.2009). “Conclusory arguments alone are not sufficient to support a request for additional time[; r]ather, it is incumbent on the defendant seeking a continuance to show concrete facts that demonstrate the particular prejudice to the defense that will necessarily arise if a delay is not granted.” Id. (quoting Golden v. State, 736 So.2d 1076, 1077-78 (¶ 6) (Miss.Ct.App.1999)).
¶ 38. There are three major problems with Miller’s argument on this issue. The first two are interrelated: if Miller had been severely mentally retarded, it should have come to his attorneys’ attention sooner. Miller needed to show both that the continuance was necessary *1165 and that its denial was prejudicial, but a stronger case for one undermines the other. Moreover, the only specific instance of reduced capacity cited by Miller’s attorneys — that Miller denied giving a statement and later claimed not to remember it when confronted with an audio recording — is, to say the least, subject to another interpretation, particularly since Miller had no apparent difficulty discussing the interview and surrounding circumstances when he testified at trial. Dr. Koestler also admitted that the intelligence tests administered to Miller were preliminary and were not evidence, in and of themselves, of mental retardation. The trial court found Miller’s contentions unconvincing, and we cannot say this was an abuse of discretion.
¶ 39. The third problem with Miller’s argument also precludes reversal: Miller has not shown that the trial court’s denial of a continuance actually resulted in injustice to him. Miller argues he needed the continuance to be more thoroughly evaluated, but after the continuance was denied, Miller did not proceed with a mental evaluation. He now argues that he was prejudiced because that testing could, have given him evidence to support his motion to suppress his statement.
¶ 40. To preserve the denial of a continuance as an issue on appeal, a defendant must raise it in his post-trial motion for a new trial. Jackson v. State, 423 So.2d 129, 132 (Miss.1982). This is not an empty formality; the defendant must renew his motion because he is expected to continue to pursue the evidence or testimony, so he can show the court what he lost by having to go to trial without the continuance. The supreme court has articulated the defendant’s responsibilities as follows:
If the court declines to grant the continuance[,] [the defendant] should sue out the proper process for [the witnesses he seeks], and when the case is called for trial should renew his application, make such changes in his affidavit as the conditions then existing require. If the continuance is still refused, he should with unremitting diligence seek to secure their attendance pending the trial by the continued use of the process of the court; if tried and convicted he should still persist in his efforts to enforce their attendance before the expiration of the term, and on his motion for a new trial present them to the court for examination; if, with all of his efforts, he is unable to have the witnesses personally present, he should, if practicable, secure their ex parte affidavits, which should be presented for the consideration of the court, which, on the motion for a new trial, will review the whole case and correct any error prejudicial to the defendant which may appear in any part of the proceeding.
King v. State, 251 Miss. 161, 171-72, 168 So.2d 637, 641 (1964) (quoting Lamar v. State, 63 Miss. 265, 271 (1885)). Miller did include this issue in his post-trial motion, but he appears to have done nothing to advance the claim. Even on appeal, Miller offers no explanation of why he could not have had his mental capacity examined after the continuance was denied. “A defendant seeking review of a denial of a continuance may not rest on possibilities” if the evidence was available to him. Pilgrim v. State, 19 So.3d 148, 153 (¶ 15) (Miss.Ct.App.2009).
¶ 41. Miller has failed to show that the trial court abused its discretion in denying his motion for a continuance, and he has not shown that the denial resulted in an injustice. This issue is without merit.
3. Suppression of Miller’s Statement
¶ 42. Miller argues that the trial court erred in denying his motion to suppress the incriminating statement he gave *1166 to the Hinds County Sheriffs Department. Miller contends that the totality of circumstances showed that the statement was not voluntarily given. He also alleges the trial court employed the wrong legal standard in reaching its decision.
¶ 43. The State bears the burden of proving that the defendant’s confession is voluntary. Scott v. State, 8 So.3d 855, 861 (¶ 24) (Miss.2008). “The burden is met by the testimony of an officer, or other person having knowledge of the facts, that the confession was voluntarily made without any threats, coercion, or offer of reward.” Id. “This makes out a prima facie case for the State on the question of voluntariness.” Id. The trial court must find beyond a reasonable doubt that the confession was voluntary and knowing and that the defendant was given his Miranda rights prior to any custodial interrogation. Id. at (¶ 23).
¶ 44. The Mississippi Supreme Court has outlined our standard of review as follows:
[A reviewing c]ourt can reverse a trial court’s denial of a motion to suppress only: if the incorrect legal principle was applied; if there was no substantial evidence to support a voluntary, knowing, and intelligent waiver of Miranda rights; and if the denial was a result of manifest error. The standard of manifest error is high, and this Court cannot reverse unless the trial judge’s ruling has gone against the substantial weight of the evidence.
Scott, 8 So.3d at 861 (¶ 22) (citations omitted).
¶ 45. Detective Latasha Holmes of the Hinds County Sheriffs Department testified at the suppression hearing. She stated that on January 28, 2008, the day after the incident, she met with Miller at the Raymond Detention Center. Detective Holmes offered Miller a “Warning and Consent to Speak” form, which she read along with him. The form recites the familiar Miranda warnings, and states:
I have read this statement of my rights and it has been read to me, and I understand what my rights are. I am willing to make a statement and answer questions. I do not want a lawyer. I understand and know what I am doing. No promises or threats have been made to me and no pressure or coercion of any kind has been used against me.
The form is signed by Miller and Detective Holmes. Miller wrote “11th” under his signature, at Detective Holmes’s request, to indicate that he had made it to the 11th grade in school. After Miller acknowledged his rights and agreed to give a statement, Holmes asked Miller if he would consent to recording the statement. Miller agreed, and she began recording. At the beginning of the recording, Detective Holmes asked Miller if he could read and write, and he replied that he could. Holmes then asked if she had read Miller his rights and he understood them; he answered in the affirmative.
¶ 46. Miller did not offer any testimony in support of the suppression motion. Instead, he relies on the circumstances surrounding the statement. Miller claims he is mentally retarded, but he offered no evidence to support this claim; Dr. Koestler, the psychologist, testified that she could not say Miller was retarded. Miller also contends that Detective Holmes did not read him the Miranda warnings, because she did not do so on the recording; but he cites no authority for the suggestion that Miranda warnings and waivers must be recorded. Instead, we have held: “[Recordings are] often beneficial to a court’s resolution of whether a confession was freely and voluntarily given to authorities. However, [they are] not required to withstand a defendant’s challenge to the validity of a confession.” Dobbs v. State, 726 So.2d 1267, 1271 n. 2 (Miss.Ct.App.1998). Miller also notes that the written waiver *1167 does not have a witness’s signature, other than that of Detective Holmes, but we likewise do not require a written waiver to admit a confession, much less one signed by two witnesses. See Armstead v. State, 978 So.2d 642, 648 (¶ 28) (Miss.2008). Finally, on appeal Miller points to his testimony at trial that he gave the statement because he had been denied a phone call and had been beaten by the other inmates. However, Miller did not offer this testimony in support of his motion to suppress. We will not consider evidence that was not presented to the trial court at the suppression hearing.
¶ 47. Miller’s challenge to the voluntariness of his statement fails because the trial court was entitled to rely on the testimony of Detective Holmes, the written waiver executéd by Miller, and his own admissions in the recorded statement. The State’s “burden is met by the testimony of an officer, or other person having knowledge of the facts, that the confession was voluntarily made without any threats, coercion, or offer of reward.” Scott, 8 So.3d at 861 (¶ 24). An appellate court “will not reverse the trial eourt[’s finding] on conflicting testimony as to whether coercion was used to obtain a confession.” Id. at (¶ 25). If we cannot reverse the trial court’s decision based on conflicting testimony, we surely cannot do so when the officer’s testimony is opposed only by conflicting inferences and the defendant’s insinuations. We find that substantial evidence supports the trial court’s decision admitting Miller’s statement.
¶ 48. Miller also contends that the trial court applied the wrong legal standard when it did not expressly state on the record that it found the State had proven Miller’s statement knowing and voluntary, beyond a reasonable doubt. Comprehensive on-the-record findings are preferable, but we have acknowledged that when the record reflects that the State met its burden, the trial court’s findings may be implicit or inferred from the judge’s comments. See Dobbs, 726 So.2d at 1271 (¶ 10).
¶ 49. We find no error in the trial court’s admission of Miller’s statement into evidence.
4. State’s Discovery Violations
¶ 50. In this issue, Miller contends that the trial court erred in not sanctioning the State for various delays in producing discovery to the defense. The case did not come to trial for more than two years. The prosecution admitted that the case had “fallen off its docket” for some time, and the trial was originally set for November 3, 2009. Discovery was not completed by the State and an agreed continuance pushed the trial date back to January 4, 2010. On December 16, 2009, the trial court granted another continuance to March 8, 2010, and ordered that the State complete discovery by December 18, 2009. Later, the State sought to admit several pieces of evidence that it failed to produce before that date. Miller made a motion on February 2, 2010, to exclude evidence that the State had not yet produced. The trial court found the State in contempt for its discovery failures, but it did not exclude all of the evidence cited by Miller.
¶ 51. At issue are the results of a DNA test on the board used in the assault (ultimately, no DNA was found), photographs of the victim and the crime scene taken shortly after the assault, and updated medical records of the victim that detailed follow-up treatment. The State stated that it had inadvertently overlooked the photographs and thought the board lost, preventing it from being more thoroughly tested.[3] The trial judge found the State to *1168 be in contempt and excluded the medical records (which had no apparent evidentia-ry value) and the DNA-test results, but it allowed the photographs into evidence. The trial court stated that it would deal with alternative sanctions for the State’s conduct at a later time. When the DNA test was completed and no DNA was found, the trial court allowed Miller to use the results to bolster his defense at trial.
¶ 52. Essentially, the only evidence Miller challenges is the photographs. Some were taken by the attending nurses as part of the rape kit, showing the injuries to the victim. The prosecution stated that it had disclosed the existence of the rape kit to the defense, but it had not separately identified or copied the pictures; instead, it had made the rape kit available for Miller’s inspection. The pictures of the crime scene were taken the day after the attack, showing the scene generally, as well as where law enforcement found the board used in the assault, blood on the ground, and the towel Abby used to clean herself after the rape. The State had disclosed the existence of the scene photographs, but it had failed to produce copies to the defense until about a week before trial.
¶ 53. Rule 9.04(1) of the Uniform Rules of Circuit and County Court states in relevant part:
If at any time prior to trial it is brought to the attention of the court that a party has failed to comply with an applicable discovery rule or an order issued pursuant thereto, the court may order such party to permit the discovery of material and information not previously disclosed, grant a continuance, or enter such other order as it deems just under the circumstances.
“We review alleged discovery violations according to the abuse of discretion standard.” Terrell v. State, 952 So.2d 998, 1006 (¶ 37) (Miss.Ct.App.2006). Thus, the trial court could potentially exclude late-produced evidence if “deemed just under the circumstances,” but the court is not required to do so. Instead, “an accused’s remedy for tardy disclosure of that to which he is entitled in pre-trial discovery is a continuance” to cure the prejudice resulting from the late disclosure. Dowbalc v. State, 666 So.2d 1377, 1385 (Miss.1996). Failure to request a continuance waives the objection to the late disclosure entirely. McGowen v. State, 859 So.2d 320, 338 (¶ 62) (Miss.2003).
¶ 54. In this case, Miller did not move for a continuance in response to the production of the photographs; he instead requested only the more severe sanction of exclusion. The fact that continuances had already been granted did not relieve Miller of his obligation to seek another one. It could be argued that Miller’s motion to suppress the photographs suffices to preserve the issue for appeal,[4] but Miller has made no showing that he was prejudiced by the late production of the photographs, much less prejudice that could not be cured by a continuance. Consequently, we find that the trial court did not abuse its discretion in refusing to suppress the photographs. This issue is without merit.
5. Sufficiency of the Evidence
¶ 55. In his final issue, Miller contends that the State did not present sufficient evidence of rape or aggravated assault. In reviewing the sufficiency of the evidence, the relevant inquiry is whether “viewing the evidence in the light *1169 most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt.” Bush v. State, 895 So.2d 836, 843 (¶ 16) (Miss.2005) (quoting Jackson v. Virginia, 443 U.S. 307, 315, 99 S.Ct. 2781, 61 L.Ed.2d 560 (1979)).
¶ 56. Miller details conflicting testimony, alleged contradictions in the evidence, and weaknesses in the State’s case against him to support this assignment of error. Miller’s argument is little more than a recitation of his theory of the case at trial. We find it unconvincing, but the question on appeal is not whether this Court believes the evidence at trial established guilt beyond a reasonable doubt; it is whether any rational trier of fact could have. Id. It is well-settled law that the jury determines the credibility of witnesses and resolves conflicts in the evidence. Davis v. State, 866 So.2d 1107, 1112 (¶ 17) (Miss.Ct.App.2003).
¶ 57. A reviewing court must view the evidence in the light most favorable to the prosecution. At issue is only whether there is evidence that “reasonable fair-minded men in the exercise of impartial judgment” could rely on to convict. Bush, 895 So.2d at 843 (¶ 16). Given the evidence we have previously discussed, we do not find the State’s proof “so lacking that a fair-minded juror could only find the defendant not guilty.” Williams v. State, 868 So.2d 346, 354 (¶ 26) (Miss.Ct.App.2003). It is well established that the testimony of the victim in a rape case is sufficient to sustain a rape conviction. Barker v. State, 463 So.2d 1080, 1082 (Miss.1985). This would be the case even if Abby’s testimony had been uncorroborated. Id. Abby’s testimony was heavily corroborated, and we can only conclude that sufficient evidence supports Miller’s convictions. This issue is without merit.
¶ 58. THE JUDGMENT OF THE CIRCUIT COURT OF HINDS COUNTY OF CONVICTION OF COUNT I, FORCIBLE RAPE, AND SENTENCE OF THIRTY YEARS; AND COUNT II, AGGRAVATED ASSAULT, AND SENTENCE OF TWENTY YEARS, WITH THE SENTENCES TO RUN CONSECUTIVELY, ALL IN THE CUSTODY OF THE MISSISSIPPI DEPARTMENT OF CORRECTIONS, IS AFFIRMED. ALL COSTS OF THIS APPEAL ARE ASSESSED TO THE APPELLANT.
LEE, C.J., BARNES, ISHEE, ROBERTS AND RUSSELL, JJ„ CONCUR. MAXWELL, J., CONCURS IN PART AND IN THE RESULT WITHOUT SEPARATE WRITTEN OPINION. CARLTON, J., DISSENTS WITH SEPARATE WRITTEN OPINION JOINED BY IRVING, P.J. MYERS, J., NOT PARTICIPATING.

. We use an alias to protect the identity of minor victims of sexual abuse.

. In his recorded statement, Miller stated he had "made it to” the 11th grade.

. The board had been tested once before for blood, and none had been found on it. At *1168 issue is a subsequent test for DNA. The board was thought lost because it had been stored as part of the rape kit after the initial testing.

. See West v. State, 553 So.2d 8, 18 (Miss.1989) (holding that a motion for a mistrial preserves the error for appeal).